[No. B073478. Second Dist., Div. Seven. Apr. 26, 1995.]

SANFORD M. PASSMAN et al., Plaintiffs and Appellants, v. JOSEPH TORKAN, Defendant and Respondent.

## COUNSEL

Sanford M. Passman and Stephen J. Gross, in pro. per., for Plaintiffs and Appellants.

Morton Minikes for Defendant and Respondent.

## OPINION

**JOHNSON, J.**—Two attorneys representing one party in litigation brought a defamation action against the opposing party based on statements he made in letters to his counsel and to the district attorney. The trial court found the alleged defamatory statements absolutely privileged and dismissed the attorneys' complaint after sustaining defendant's demurrer without leave to amend. We affirm.

### FACTS AND PROCEEDINGS BELOW

Defendant and respondent, Joseph Torkan, and Iraj Kermanshahchi (Iraj) were stockholders in a corporation which operated a parking lot near the Los

Angeles International Airport. On August 14, 1990, Torkan brought suit against Iraj for dissolution of the corporation and for appointment of a receiver. Torkan claimed Iraj fraudulently failed to report and account for the corporation's gross receipts. This action was ordered consolidated with an action Iraj and the corporation had brought against Torkan.

After the trial court determined Torkan held a 20 percent stock ownership interest in the corporation, Iraj elected in lieu of dissolution to purchase Torkan's interest (Corp. Code, § 2000, subd. (a)).[1] The trial court appointed three appraisers when Iraj and Torkan could not agree on the fair market value of Torkan's interest. (Corp. Code, § 2000, subd. (c).) The appraisers were directed to ascertain the value of the corporation's assets and the value of the corporation as an ongoing business.

In these consolidated actions Torkan was represented by Martin Shapero of the law firm of Shapero & Shapero. Plaintiffs and appellants, Sanford M. Passman and Stephen J. Gross, represented Iraj and the corporation.

During the course of the litigation, Torkan wrote a letter dated June 17, 1992, to his attorney, Martin Shapero. Torkan sent copies of this letter to two of the court-appointed appraisers.

On July 17, 1992, appellants brought suit against Torkan for defamation. Their first amended complaint alleged Torkan's letter of June 17, 1992, contained four separate statements libelous of and concerning appellants. These statements are as follows:

(1) ". . . The letter of Mr. Passman is with the intent to poison the minds of the appraisers with the exception of Mr. Miller, who already has served the purpose of Messrs. Kermanshahchi, Gross, and Passman. Mr. Kermanshahchi, Passman and Gross have done and are doing everything in

---

[1]Corporations Code section 2000 provides in pertinent part:

"(a) Subject to any contrary provision in the articles, in any suit for involuntary dissolution, or in any proceeding for voluntary dissolution initiated by the vote of shareholders representing only 50 percent of the voting power, the corporation or, if it does not elect to purchase, the holders of 50 percent or more of the voting power of the corporation (the 'purchasing parties') may avoid the dissolution of the corporation and the appointment of any receiver by purchasing for cash the shares owned by the plaintiffs or by the shareholders so initiating the proceeding (the 'moving parties') at their fair value. The fair value shall be determined on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation. . . .

" . . . . . . . . . . . . . . . . . . . . . . . .

"(c) The court shall appoint three disinterested appraisers to appraise the fair value of the shares owned by the moving parties, and shall make an order referring the matter to the appraisers so appointed for the purpose of ascertaining such value. . . ."

their powers to mislead the appraisers that the corporation is worth nothing. . . ."

(2) ". . . Why have Messrs. Kermanshahchi, Gross and Passman vigorously objected and prevented such a fair request? Well, it is obvious; the stealing of cash would have been stopped and more proof of their criminal conspiracy would have been revealed. . . ."

(3) ". . . All these facts which are documented and can be proven show how this criminal conspiracy against me was planned from the beginning by Mr. Kermanshahchi and the people who assisted him in order to steal my entire interest in the corporation. . . ."

(4) "[T]here has been a conspiracy against me by Mr. Kermanshahchi, and later with the direct help, involvement and guidance of Messrs. Passman and Gross to forge the blank minutes of the corporation, which were signed by me. . . ."[2]

---

[2]Torkan's June 17, 1992, letter to his attorney stated in part:

"I am writing this letter to you in response to a letter which was written to you and Mr. Baverman by Mr. Passman. Mr. Passman indicated in his letter to Mr. Baverman that the phony appraisal of Mr. Miller should be accepted.

"You are well aware that Mr. Miller's aforesaid appraisal is falsified and a shameful fabrication, since we purchased the lease/option property in 1986 at a value of $57.00 per square foot, which was considered a bargain at the time, and that is why Mr. Kermanshahchi unfortunately joined us in this venture. Mr. Miller's appraisal for the year of 1989 has decreased to approximately $49.00 per square foot, which does not make sense considering the fact that at the time we purchased the lease/option land in 1986, the property was a raw land [sic] without creation of concourse way street [sic], had no traffic signal lights and no hotel. Since then the luxurious Hotel Stouffer was completed in 1987 with a street crossing at 102 Street, and a signalized corner was created for the property adjacent to the Stouffer Hotel. Also considering the fact that from 1986 to 1989 the land value has doubled and tripled, let alone the improvements which were done in the area after we acquired the land. The record shows that a raw land opposite of our property on West Century Boulevard was purchased in March of 1985 for $77.00 per square foot, which is the closest and the most practical evaluation of raw land on West Century Boulevard.

"Therefore, Mr. Miller's shameful appraisal of $49.00 per square foot based in August 1989 is nothing but pure fabrication. It is quite clear what has made Mr. Miller come up with such a shameful appraisal and why Messrs. Passman and Kermanshahchi insist that their man's falsified appraisal should be the basis of the value of the property which greatly reflects the value of the stock of the corporation as well. The letter of Mr. Passman is with the intent to poison the minds of the appraisers with the exception of Mr. Miller, who already has served the purpose of Messrs. Kermanshahchi, Gross and Passman. Mr. Kermanshahchi, Passman and Gross have done and are doing everything in their powers to mislead the appraisers that the corporation is worth nothing and that the value of the property, which is the main asset of the corporation, is worth nothing, and, in fact, below the purchase price in the year 1986.

". . . . . . . . . . . . . . . . . .

"Mr. Shapero, you are well aware that from Day One of my involvement in this regrettable association with Mr. Kermanshahchi, there has been a conspiracy against me by Mr. Kermanshahchi, and later with the direct help, involvement and guidance of Messrs. Passman and

These four statements formed the basis for the first four causes of action in the amended complaint.

On May 29, 1991, Torkan wrote a letter addressed to the district attorney's office urging criminal prosecution of Iraj. The letter outlined various allegedly criminal or fraudulent activities undertaken by Iraj and offered documentary and testimonial evidence in support of the allegations. One of Torkan's statements in the May 29, 1991, letter to the district attorney's office was the basis for the fifth cause of action in appellants' amended complaint. This statement is as follows: ". . . This man, with the help of two of his crooked attorneys . . . have conspired to defraud me. . . ."

Torkan demurred to the first amended complaint on the grounds the litigation and official proceedings privileges of Civil Code section 47,

---

Gross to forge the blank Minutes of the corporation, which were signed by me and held by Mr. Kermanshahchi. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Mr. Shapero, two and one-half years have gone by since the Court Order was issued by Judge Shimer, and over five years have gone by since the parking lot has been in operation. It is unfair and a great injustice to me that I, who found the property, prepared the parking, invested my money and time to create this project should not be able to collect a dime, while a con artist (Mr. Kermanshahchi) continues to steal cash from the parking lot and continue his sham without anyone watching him or knowing what he does. In fact, he has taken all of his investment out during these past five years.

"Now after five years Mr. Kermanshahchi and his co-conspirators are shamefully trying their best to show that the property and corporation are worth nothing. The Iranian accountant of Mr. Kermanshahchi as well has been involved in this conspiracy which is a proven fact by lying in his sworn deposition.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"All these facts which are documented and can be proven show how this criminal conspiracy against me was planned from the beginning by Mr. Kermanshahchi and the people who assisted him in order to steal my entire interest in the corporation.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Mr. Shapero, I have no doubt of your decency and integrity to follow-up on my case, but I can not comprehend that after all the illegal actions and a pure criminal conspiracy against me that I must wait for two and one-half years for an appraisal and accounting and that for a total of five years for Mr. Kermanshahchi has been free to operate and steal cash under his total control. While I was in deep sleep trusting this man, he was stealing cash, and then for the past two and one-half years he has continued to do so without anyone questioning him.

"Mr. Shapero, why have the appraisers not even responded to your request to have a parking management company manage and control the operation of the parking lot which is customary and normal for such a business? Why have Messrs. Kermanshahchi, Gross and Passman vigorously objected and prevented such a fair request? Well, it is obvious; the stealing of cash would have been stopped and more proof of their criminal conspiracy would have been revealed.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"I demand that after five years of injustice done to me and tremendous agony and pain that you take immediate action to accelerate the fate of this unusual and unfortunate happening in my case. . . ."

subdivision (b) operated as a complete defense to the causes of action for defamation.[3] The trial court sustained the demurrer without leave to amend and dismissed the complaint. Appellants appeal from the ensuing judgment of dismissal.

## DISCUSSION

■ On appeal from a judgment of dismissal after a demurrer is sustained without leave to amend, " ' " '[w]e treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' . . . Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. . . . When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. . . . And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. . . . The burden of proving such reasonable possibility is squarely on the plaintiff." ' " (*Abraham* v. *Lancaster Community Hospital* (1990) 217 Cal.App.3d 796, 809 [266 Cal.Rptr. 360], citations omitted.)

As we explain, the alleged defamatory statements in the case at bar are absolutely privileged as publications made in a judicial proceeding or in an official proceeding authorized by law. (Civ. Code, § 47, subd. (b).)[4] Because the privilege operates as a complete defense to the causes of action raised in the complaint, we conclude the trial court did not abuse its discretion in sustaining the demurrer without leave to amend and in dismissing the complaint. Accordingly, we affirm the judgment.

I. *The Four Allegedly Defamatory Statements Made in Torkan's June 17, 1992, Letter to His Attorney Were Absolutely Privileged as Publications Made in a Judicial Proceeding.*

Under section 47, a privileged publication or broadcast is one made "(b) In any . . . (2) judicial proceeding. . . ." ■ The purpose underlying the immunity conferred by the so-called litigation privilege "is the broadly applicable policy of assuring litigants 'the utmost freedom of access to the courts to secure and defend their rights. . . .' (*Albertson* v. *Raboff* (1956) 46

---

[3]Torkan also demurred to the cause of action based on the May 1991 letter on the grounds it was barred by the one-year statute of limitations of Code of Civil Procedure section 340, subdivision (3) for actions alleging libel and slander. However, the trial court did not rely on this alternative theory in sustaining Torkan's demurrer without leave to amend.

[4]All further statutory references are to the Civil Code unless otherwise indicated.

Cal.2d [375] at p. 380 [295 P.2d 405].)" (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044].) Or as restated by the Supreme Court in *Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 213 [266 Cal.Rptr. 638, 786 P.2d 365], the purpose of the privilege is to afford litigants "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions."

To effect these purposes the privilege afforded by section 47, subdivision (b) is held to be absolute in nature. (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 215; see also 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 498, p. 585.) This absolute privilege applies to "virtually all other causes of action, with the exception of an action for malicious prosecution." (*Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417].) In addition, with statutory exceptions not relevant here, section 47, subdivision (b) applies "to *all* publications, irrespective of their maliciousness." (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 216, italics in original; see also 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 498, at p. 585.) This is true "even though the publication is made outside the court-room and no function of the court or its officers is invoked." (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 381 [295 P.2d 405].)

█ For communications to be absolutely privileged they must be: "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 212.)

Appellants concede Torkan's June 17, 1992, letter to his attorney satisfies the first three requirements. █ Appellants challenge, however, whether the communications had some connection or logical relation to the action. Underlying this argument, however, appellants nevertheless appear to challenge whether the purpose of the communications was "to achieve the objects of the litigation."

In *Silberg* v. *Anderson, supra,* 50 Cal.3d 205, the Supreme Court overruled a line of cases which added an additional requirement the publication "further the interests of justice" to be covered by the absolute privilege. (See, e.g., *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818 [106 Cal.Rptr. 718].) The court found this requirement inconsistent with numerous decisions holding fraudulent or perjurious communications were nevertheless covered by the privilege. The court noted ". . . the 'interest of justice' requirement would be tantamount to the exclusion of *all* tortious publications from the privilege, because tortious conduct is invariably inimical to the 'interest of justice.' Thus, the exception would subsume the rule." (50 Cal.3d at p. 218, italics in original.)

Thus the court held the "requirement that the communication be in furtherance of the objects of the litigation is, in essence, simply part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action. A good example of an application of the principle is found in the cases holding that a statement made in a judicial proceeding is not privileged unless it has some reasonable relevancy to the subject matter of the action. (E.g., *Washer* v. *Bank of America* (1943) 21 Cal.2d 822 [136 P.2d 297, 155 A.L.R. 1338]; *Carpenter* v. *Ashley* (1906) 148 Cal. 422 [83 P. 444]; *Irwin* v. *Newby* (1929) 102 Cal.App. 110 [282 P. 810].) The 'furtherance' requirement was never intended as a test of a participant's motives, morals, ethics or intent. [Citations.]" (50 Cal.3d at pp. 219-220.)

Here there can be no doubt Torkan's letter to his attorney containing the allegedly defamatory statements had "some relation" to the lawsuit (*Rubin* v. *Green, supra,* 4 Cal.4th at p. 1194) and therefore was not "extraneous to the action" (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 220). The whole purpose of the letter was to prompt action by his attorney to conclude the lawsuit before Iraj dissipated any more funds. In the letter Torkan expressed his concern the appraisers were being misled as to the corporation's worth by allegedly erroneous information supplied by Iraj and his agents. Not only did Torkan's letter "have some logical relation to" the lawsuit (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 220), it bore directly on the subject matter being litigated, namely the value of the business as a going concern. As such, Torkan's letter, and the allegedly defamatory statements contained in it, was absolutely privileged under section 47, subdivision (b).

Because Torkan's communication to his attorney was clearly related to the underlying litigation, the facts of this case do not present this court with an opportunity to test the outer limits of "relevancy" to determine when a given communication may be deemed "extraneous to the action." (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 220.) We therefore decline appellants' invitation to do so.

Appellants argue the rationale underlying the absolute privilege of section 47, subdivision (b) is "fundamentally wrong." They suggest the privilege ought to be limited to only those publications made without malice. This argument is not well taken.

To except publications made with malice from section 47, subdivision (b)'s immunity would be contrary to decisions of our Supreme Court (see, e.g., *Ribas* v. *Clark, supra,* 38 Cal.3d at p. 364; *Washer* v. *Bank of America, supra,* 21 Cal.2d 822, 832). It would also be contrary to legislative intent for

absolute immunity for all qualifying communications under section 47, subdivision (b), regardless of their maliciousness. (See, e.g., *Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 216.) Our Supreme Court has recognized some bona fide injuries might go uncompensated. However, our highest court has concluded the ". . . salutary policy reasons for an absolute privilege supersede individual litigants' interests in recovering damages for injurious publications made during the course of judicial proceedings." (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 218.)

As an intermediate appellate court, we are bound to follow the decisions of our Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) "Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court." (57 Cal.2d at p. 455.) We thus reject appellants' request for this court to carve out an exception to section 47, subdivision (b)'s absolute privilege for publications made in judicial proceedings.

II. *Torkan's Communication of May 29, 1991, to the District Attorney's Office Is Absolutely Privileged as a Publication in an Official Proceeding Authorized by Law.*

■ The fifth cause of action of the amended complaint alleged appellants were defamed by a statement Torkan made in a May 29, 1991, letter to the district attorney's office. In the letter Torkan claimed Iraj had committed numerous fraudulent and criminal acts and asked the district attorney to bring a criminal action to prosecute Iraj. In the letter Torkan also referred to appellants as "crooked."

Appellants do not seriously dispute Torkan's communication to the district attorney's office qualifies for immunity under section 47 as a publication "in any other official proceeding authorized by law." (§ 47, subd. (b)(3).) The purpose and intent of the letter was designed to prompt a criminal prosecution by the official agency responsible for bringing such actions. As such, the communication was absolutely privileged under section 47, subdivision (b). (See e.g., *Hunsucker* v. *Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1502-1504 [28 Cal.Rptr.2d 722] [communication to police]; *Cote* v. *Henderson* (1990) 218 Cal.App.3d 796, 806 [267 Cal.Rptr. 274] [communication to police and district attorney's office]; *Kim* v. *Walker* (1989) 208 Cal.App.3d 375, 383 [256 Cal.Rptr. 223] [communication to parole officer]; *Williams* v. *Taylor* (1982) 129 Cal.App.3d 745, 753-754 [181 Cal.Rptr. 423] [communication to police]; see also *Tiedemann* v. *Superior Court* (1978) 83 Cal.App.3d 918 [148 Cal.Rptr. 242] [complaint to enforcement branch of Internal Revenue Service regarding potential fraud]; *King* v.

*Borges* (1972) 28 Cal.App.3d 27 [104 Cal.Rptr. 414] [complaint about agent to Department of Real Estate]; *Imig* v. *Ferrar* (1977) 70 Cal.App.3d 48 [138 Cal.Rptr. 540] [complaint about police officer to Los Angeles Police Department]; *Chen* v. *Fleming* (1983) 147 Cal.App.3d 36 [194 Cal.Rptr. 913] [complaints about attorney to State Bar]; and cases collected in 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 512, at pp. 601-602.)

In the early case of *Washer* v. *Bank of America, supra*, 21 Cal.2d 822, the Supreme Court held the defendant's defamatory statements to the press, repeating the National Labor Relations Board's findings regarding a discharged employee, did not qualify for absolute immunity. The court reasoned "[t]he extension of this absolute privilege to statements not made in the judicial or legislative proceeding itself is . . . limited . . . to communications such as those made by a client to his attorney or by an individual to a prosecuting attorney or other public officer preliminary to a proposed criminal proceeding. . . ." (21 Cal.2d at p. 832.)

The decision in *Williams* v. *Taylor, supra*, 129 Cal.App.3d 745, is the leading example of a case conferring absolute immunity on communications made to official governmental agencies for the purpose of prompting action by that agency. In *Williams* the president of a car dealership learned there were problems in the body shop and began an investigation. He discovered numerous inconsistencies in the company's work records, including missing repair orders, fictitious names on various repair orders, inaccurate time logs and other problems. He notified the police who conducted an official investigation. The police submitted their report to the district attorney who filed a complaint charging plaintiff with two counts of grand theft. One count was dismissed prior to trial and plaintiff was acquitted of the other. The plaintiff brought suit against the company and its president. The trial court granted summary judgment in favor of the defendants and the appellate court affirmed.

In affirming, the appellate court held the defendants' statements to the police were absolutely privileged. "Section 47, subdivision 2 [now (b)] provides for an absolute privilege with regard to statements made 'in any . . . official proceeding authorized by law.' In our view, a communication concerning possible wrongdoing, made to an official governmental agency such as a local police department, and which communication is designed to prompt action by that entity, is as much a part of an 'official proceeding' as a communication made after an official investigation has commenced. [Citation.] After all, '[t]he policy underlying the privilege is to assure utmost freedom of communication between citizens and public authorities whose responsibility it is to investigate and remedy wrongdoing.' [Citation.] In

order for such investigation to be effective, 'there must be an open channel of communication by which citizens can call his attention to suspected wrongdoing. That channel would quickly close if its use subjected the user to a risk of liability for libel. A qualified privilege is inadequate under the circumstances. . . . [¶] The importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity outweighs the occasional harm that might befall a defamed individual. Thus, the absolute privilege is essential. . . .' " (*Williams* v. *Taylor, supra*, 129 Cal.App.3d at pp. 753-754.)

Nevertheless, appellants claim defamatory communications made to officials, such as the police or prosecuting attorneys, should only be entitled to a qualified privilege. They argue statements made outside a judicial proceeding to government officials who are not litigants in the action should not be privileged if made with malice. As appellants point out, one decision of the Court of Appeal, *Fenelon* v. *Superior Court* (1990) 223 Cal.App.3d 1476 [273 Cal.Rptr. 367], tends to support this view.

In *Fenelon* the defendant made a knowingly false report to police the plaintiff had solicited murder. Relying on authority from other jurisdictions, the majority of the *Fenelon* court held statements made solely to police concerning suspected criminal activity were not made in "an official proceeding" and were only entitled to a qualified immunity. The majority reasoned the phrase "official proceedings" only referred to quasi-judicial proceedings providing notice, hearing and review. (223 Cal.App.3d at p. 1480.) Only statements made in quasi-judicial proceedings providing these safeguards qualified for absolute immunity under section 47, subdivision (b)(3) as communications made in an official proceeding. (223 Cal.App.3d at p. 1482.) Thus, the majority held reports to law enforcement agencies would only be privileged if the communications qualified under section 47, subdivision (c) as a communication made without malice to other interested persons. (223 Cal.App.3d at p. 1483.)

The dissent in *Fenelon* observed neither the Restatement Second of Torts, section 587, nor the decisional law of California, nor treatise writers on the subject of privilege, agreed with the majority's narrow view of "official proceedings." (223 Cal.App.3d at pp. 1485-1486.)

To date no reported appellate decision has followed the reasoning and rationale of *Fenelon*. On the other hand, the *Fenelon* decision was recently criticized in *Hunsucker* v. *Sunnyvale Hilton Inn, supra*, 23 Cal.App.4th 1498.

We believe the dissent in *Fenelon* and the line of decisions represented by *Washer* and *Williams* present the better view. Indeed the decision in *Fenelon*

appears to conflict with the decision in *Slaughter* v. *Friedman* (1982) 32 Cal.3d 149 [185 Cal.Rptr. 244, 649 P.2d 886] in which the Supreme Court apparently approved applying the "official proceeding" privilege to informal communications to law enforcement officers. In distinguishing communications between private parties, the *Slaughter* court noted the " 'official proceeding' privilege has been interpreted broadly to protect communications to or from *governmental* officials which may precede the initiation of formal proceedings." (32 Cal.3d at p. 156, italics in original.)

Other authorities are in accord with the *Slaughter* court's view of the extent of the absolute immunity for communications in "official proceedings." The Restatement Second of Torts section 587 provides: "A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in *communications preliminary to a proposed judicial proceeding*, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding." (Italics added.) Comment b to section 587 clarifies the absolute privilege "applies to communications made by a client to his attorney with respect to proposed litigation as well as to information given *and informal complaints made to a prosecuting attorney or other proper officer preliminary to a proposed criminal prosecution whether or not the information is followed by a formal complaint or affidavit*." (Italics added.) As stated by a noted treatise: "Although there is some authority to the contrary, the better view seems to be that an informal complaint to a prosecuting attorney or a magistrate is to be regarded as an initial step in a judicial proceeding, and so entitled to an absolute, rather than a qualified immunity." (Prosser & Keeton on Torts (5th ed. 1984) § 114, pp. 819-820, fn. omitted.)[5]

Accordingly, we conclude communications designed to prompt a criminal prosecution directed to an official governmental agency empowered to commence criminal prosecutions are absolutely privileged as publications made in an official proceeding authorized by law. (§ 47, subd. (b)(3).)

It follows the trial court properly sustained the demurrer without leave to amend to appellants' fifth cause of action based on Torkan's letter to the district attorney's office.

---

[5]Similarly, Robert D. Sack, in his book, Libel, Slander and Related Problems (1980) pages 273-274 notes, "[p]arties to judicial proceedings have the same absolute immunity as do attorneys for defamatory statements made prior to, in the institution of, or during the courses of, a proceeding. Also protected are statements made by a party to his attorney, and, in many jurisdictions, 'formal and informal complaints to prosecuting authority. . . .' " (Fn. omitted; see also Note, *Absolute Privilege and California Civil Code Section 47(2): A Need for Consistency* (1982) 14 Pacific L.J. 105, 114 ["The privilege thus extends to publications made not only in a courtroom, but also to publications made in anticipation of a proceeding, in preparation for a pending action, or in the initiation of investigatory or formal proceedings." (Fns. omitted.)]

## Disposition

The judgment is affirmed. Respondent to recover his costs of appeal.

Lillie, P. J., and Woods (Fred), J., concurred.