[No. B092937. Second Dist., Div. Three. Oct. 1, 1996.]

BARRY K. ROTHMAN et al., Plaintiffs and Appellants, v.
MICHAEL JACKSON et al., Defendants and Respondents.

1136

## COUNSEL

Wylie A. Aitken, Darren O. Aitken and Herbert Hafif for Plaintiffs and Appellants.

Kinsella, Boesch, Fujikawa & Towle, Dale F. Kinsella, Catherine H. Coleman, Alan R. Kossoff, Katten, Muchin, Zavis & Weitzman, Katten, Muchin & Zavis, Mark A. Wooster, Zia F. Modabber and E. Randol Schoenberg for Defendants and Respondents.

## OPINION

**CROSKEY, Acting P. J.**—Barry K. Rothman and the Law Offices of Barry K. Rothman (hereafter, collectively, Rothman) appeal from judgments of

dismissal entered in favor of Michael Jackson, MJJ Productions, Inc. (hereafter, collectively, Jackson), Bertram Fields, the Law Offices of Greenberg, Glusker, Fields, Claman & Machtinger (Fields), Anthony Pellicano and the Pellicano Investigative Agency (Pellicano) in Rothman's action for defamation, tortious interference with business relationships and intentional infliction of emotional distress. The judgments were entered after the defendants' demurrers were sustained without leave to amend. The demurrers were sustained as to all causes of action *solely* on the ground of the litigation privilege in Civil Code section 47, subdivision (b).[1]

We reverse. The challenged statements were made by the defendants in a press conference, and not in any context which the litigation privilege exists to protect. The privilege in section 47, subdivision (b) does not apply to the statements made in this case.

FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts in this case are taken from Rothman's complaint and are deemed to be true. (See *Moore* v. *Conliffe* (1994) 7 Cal.4th 634, 638 [29 Cal.Rptr.2d 152, 871 P.2d 204].) In July of 1993, Rothman was retained by Mr. C. and his son, a minor, to seek redress against the popular singer, Michael Jackson, for alleged torts against the boy. Rothman contacted Jackson and began to negotiate on behalf of the C. family, but did not immediately file a lawsuit, as the family wished the matter kept confidential.

While negotiations were proceeding, a psychological evaluation of the boy, which had been filed with the Los Angeles County Department of Children's Services, as required by California's child abuse reporting laws (§ Pen. Code, § 11164 et seq.), was "leaked" by a person or persons unknown. However, no claim has been made that Rothman or his clients were responsible for the leak. In any event, whoever caused the leak, its result was what Rothman characterizes as a "firestorm" of publicity, for Jackson is a celebrity among celebrities, and the charges contained in the psychological evaluation were sensational.

---

[1]Unless otherwise noted, further statutory references are to the Civil Code.

In parts pertinent to this discussion, section 47 provides: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) [concerning the writ of mandate] of Title 1 of Part 3 of the Code of Civil Procedure . . . ." Effective January 1, 1991, section 47 was renumbered, so that former subdivisions (1) through (5) are now designated as subdivisions (a) through (e), and the internal subdivisions of subdivision (b) and following are designated as subdivision (b)(1) and so forth. (Stats. 1990, ch. 1491, § 1, p. 6909.) Section 47 and all of its subdivisions will be referred to throughout this opinion by their current letter and number designations.

The defendants responded to this negative public exposure by calling a press conference on August 29, 1993, and by making other statements to the media thereafter, in which the defendants not only denied the charges against Jackson, but made countercharges that Rothman and his clients had knowingly and intentionally made false accusations against Jackson in order to extort money from him. Extortion is, of course, a crime (Pen. Code, § 518 et seq.), and the charge was inevitably damaging to Rothman's professional reputation. Moreover, as an additional consequence of the extortion charges, Rothman felt compelled to withdraw from his representation of the C. family, causing him significant economic damage, as the C.'s eventually retained other counsel who negotiated a settlement with Jackson that was never disclosed to the public, but was reputed to be over $25 million.

On July 29, 1994, Rothman filed his original complaint for conspiracy to interfere with a business relationship, defamation and intentional infliction of emotional distress. Demurrers were sustained with leave to amend as to all causes of action except conspiracy. The first amended complaint was filed on December 21, 1994. Demurrers filed on January 25, March 14 and March 15, 1995, were sustained *without* leave to amend. All parties stipulated to the sustaining of the demurrer solely on the ground of the litigation privilege (§ 47, subd. (b)), so the issue of privilege could be resolved as soon as possible. Subsequent motions for a new trial were denied. This timely appeal followed.

## CONTENTIONS

Rothman contends the trial court erred in sustaining the defendants' demurrer on the ground of the litigation privilege set forth in section 47, subdivision (b), as that privilege does not protect statements to nonparticipants in the litigation, and, in particular, does not protect the statements to the media made in this case.

## DISCUSSION

### 1. *Standard of Review*

On appeal of a judgment of dismissal following the sustaining of a demurrer, the appellate court assumes the truth of all properly pleaded material allegations of the complaint and gives the complaint a reasonable interpretation by reading it as a whole and its several parts in context. (*Moore* v. *Conliffe, supra,* 7 Cal.4th at p. 638; *Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 210 [266 Cal.Rptr. 638, 786 P.2d 365].) The interpretation of section 47, subdivision (b) is a pure question of law which we review

independently. (*Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791, 799-801 [35 Cal.Rptr.2d 418, 883 P.2d 960] [application of a rule of law to undisputed facts is a question of law, subject to independent review]; *Susan A.* v. *County of Sonoma* (1991) 2 Cal.App.4th 88, 93 [3 Cal.Rptr.2d 27] [availability of the litigation privilege is a matter of law if facts are undisputed].)

### 2. General Principles Governing the Litigation Privilege (§ 47, subd. (b))

Defamation consists of false and unprivileged written, oral or recorded publications which expose the defamed person to hatred, contempt, ridicule or obloquy or cause the person to be shunned or avoided or injured in his or her occupation (§ 45, defining libel), or which charge the person with crime, suggest that the person has an infectious or loathsome disease or is impotent or unchaste, tend to injure the person in his or her business or profession, or otherwise cause actual damage (§ 46, defining slander). It is undisputed that the statements alleged in this case fall within the above definitions. In any event, the sole basis upon which the defendants' demurrers were sustained was that the statements—whatever their nature—were absolutely privileged under section 47, subdivision (b). Thus, the sole issue on appeal is whether that privilege was correctly applied.

■ The general principles governing the application of the litigation privilege are familiar. The privilege applies to any publication or other communication required or permitted by law in the course of a judicial or quasi-judicial proceeding to achieve the objects of the litigation, whether or not the publication is made in the courtroom or in court pleadings, and whether or not any function of the court or its officers is involved. (*Moore* v. *Conliffe, supra*, 7 Cal.4th at p. 641; *Silberg* v. *Anderson, supra*, 50 Cal.3d at p. 212; *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 380-381 [295 P.2d 405].) The privilege also applies to statements made in dialogues preliminary to litigation. (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044].) The privilege, if applicable, would preclude not only a defamation action, but also any actions by Rothman for intentional interference with existing and prospective economic relationships (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1123, 1132 [270 Cal.Rptr. 1, 791 P.2d 587]; *Silberg* v. *Anderson, supra*, 50 Cal.3d at p. 215) and intentional infliction of emotional distress (*Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417]; *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 579 [131 Cal.Rptr. 592]). Only malicious prosecution actions are exempt from section 47, subdivision (b). (*Rubin* v. *Green, supra*, 4 Cal.4th at p. 1194; *Financial Corp. of America* v. *Wilburn* (1987) 189 Cal.App.3d 764, 771 [234 Cal.Rptr. 653].)

■ The privilege is generally described as applying to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg* v. *Anderson, supra*, 50 Cal.3d at p. 212; *Susan A.* v. *County of Sonoma, supra*, 2 Cal.App.4th at p. 93.) The Supreme Court has characterized the third prong of the foregoing test, the requirement that a communication be in furtherance of the objects of the litigation, as being "simply part of" the fourth, the requirement that the communication be connected with, or have some logical relation to, the action. (*Silberg* v. *Anderson, supra*, 50 Cal.3d at pp. 219-220.) The high court has specifically disapproved any interpretation of the "furtherance" requirement as a test of the motives, morals, ethics or intent of the person claiming the privilege. (*Id.* at p. 220.) Statements to nonparticipants in the action are generally not privileged under section 47, subdivision (b), and are thus actionable unless privileged on some other basis. (50 Cal.3d at p. 219; *Susan A.* v. *County of Sonoma, supra*, 2 Cal.App.4th at pp. 93, 95-96; *Financial Corp. of America* v. *Wilburn, supra*, 189 Cal.App.3d at p. 778.)

The question whether the litigation privilege covered statements which were made to the press during judicial or quasi-judicial proceedings has been directly ruled upon by the Supreme Court only once. That was in *Washer* v. *Bank of America* (1943) 21 Cal.2d 822 [136 P.2d 297, 155 A.L.R. 1338] (disapproved on other grounds in *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 551 [343 P.2d 36].) In *Washer*, the bank discharged Washer and was ordered by the National Labor Relations Board to reinstate him, whereupon a bank vice-president made a statement to the press clearly implying that Washer had been fired for falsifying an expense account and "flagrant insubordination." (21 Cal.2d at pp. 824-825.) When Washer sued for defamation, the trial court sustained demurrers by the defendants and dismissed the action. The Supreme Court reversed. Among other things, the high court held the vice-president's statements to the press were not protected by the privilege in section 47, subdivision (b), because "[n]one of the authorities cited by the respondents extend[ed] the privilege beyond a communication to one actually involved in the proceeding, either as a judge, attorney, party, or witness." (21 Cal.2d at p. 832.)

In *Albertson* v. *Raboff, supra*, 46 Cal.2d 375, the Supreme Court held that the scope of the litigation privilege includes any publication that has "a reasonable relation to the action." (*Id.* at p. 381.) This construction of the privilege broadened its coverage to include both *publications* not previously understood to be covered, and publications addressed to *persons* other than a "judge, attorney, party, or witness" in the proceeding to which the challenged publication related. Nevertheless, *Albertson* did not overrule the

precedent established by *Washer* respecting statements to the public at large through the press. Far from it. The publication that was challenged in *Albertson* was a lis pendens recorded as to property in which the plaintiff in a previous lawsuit—the defendant in the defamation action—claimed an interest, which he sought to enforce by means of his suit. (*Id.* at pp. 377-378.)

In ruling for the defamation defendant in *Albertson*, the Supreme Court reasoned as follows: "[T]he privilege applies to any publication, such as the recordation of a notice of *lis pendens*, that is required (e.g., Code Civ. Proc., § 749) or permitted (e.g., Code Civ. Proc., § 409) by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is invoked [Citation]. Thus, it is not limited to the pleadings, the oral or written evidence, to publications in open court or in briefs or affidavits. If the publication has a reasonable relation to the action and is permitted by law, the absolute privilege attaches. [Citations.] It therefore attaches to the recordation of a notice of *lis pendens*, for such a publication is permitted by law, and like other documents that may be filed in an action, it has a reasonable relation thereto and it is immaterial that it is recorded with the county recorder instead of being filed with the county clerk." (46 Cal.2d at pp. 380-381.)[2] A lis pendens is a far cry from a press release trumpeting one party's version of a legal dispute, albeit that both are addressed to the public at large.

In *Bradley v. Hartford Acc. & Indem. Co.*(1973) 30 Cal.App.3d 818 [106 Cal.Rptr. 718], the Court of Appeal, without citing *Washer,* held the litigation privilege did not apply to certain statements to the press and also suggested in dictum that the privilege did not apply to other statements which were made in documents filed with a court, because it appeared the documents were filed with the sole intent of having the defamatory statements republished in the media. (*Id.* at p. 826.) Regarding the alleged defamations inserted in court documents, the *Bradley* court reasoned that if statements of this ilk were protected by the litigation privilege, the effect

---

[2]In 1956, when *Albertson, supra,* was decided, Code of Civil Procedure section 749 provided for procedures in an action for quiet title by an adverse possessor. The statute *required* the filing of a lis pendens in connection with such an action. Section 749 was repealed in 1980. (Stats. 1980, ch. 44, § 8, p. 109.) Its provisions have been substantially reenacted in sections 760.020, 761.010 (requirement that lis pendens be filed), 761.020, 762.010, 762.060 and 763.010. (The current section 749 concerns actions for forgery of a trust deed on residential property.)

In 1956, Code of Civil Procedure section 409 *permitted* the filing of a lis pendens in connection with any action concerning real property or affecting title to it or the right of possession of it. Section 409 was repealed in 1992. (Stats. 1992, ch. 883, § 1.) Section 405.20 now permits the filing of a lis pendens by a party to an action who asserts such a claim.

would be to provide absolute immunity to "the resourceful slanderer." To avoid this, the court reasoned that "in determining whether or not [a] defamatory publication should be accorded an absolute privilege, *special emphasis must be laid on the requirement that it be made in furtherance of the litigation and to promote the interest of justice.*" (*Ibid.*, italics in original.) Regarding the defendants' strictly extrajudicial statements—the only statements that were actually at issue in the appeal (*ibid.*)—the *Bradley* court cited several out-of-state authorities for the proposition that defamatory words spoken *in a judicial proceeding* are protected even if they would be actionable if spoken elsewhere (*Id.* at pp. 827-828), but "an attorney who wishes to litigate his case in the press will do so at his own risk." (*Id.* at p. 828.)

In *Silberg* v. *Anderson, supra,* 50 Cal.3d 205, the Supreme Court disapproved *Bradley*'s "interest of justice" test for a statement to be protected by the litigation privilege (*Id.* at pp. 216-219), stating that the *Bradley* court had incorrectly read this test into the requirement that a privileged communication be in furtherance of the objects of the litigation. (*Id.* at p. 217.) The *Silberg* court stated that "[t]he 'furtherance' requirement was never intended as a test of a participant's motives, morals, ethics or intent." (*Id.* at p. 220.) However, in disapproving the "interest of justice" test, the *Silberg* court reaffirmed, albeit in dictum, *Bradley*'s holding that statements to persons with no connection to a case are not covered by the litigation privilege (*Id.* at p. 219), and did not disapprove *Bradley*'s generalization that "litigating in the press" is not privileged under section 47, subdivision (b). Indeed, the *Silberg* court observed that the "interest of justice" test was unnecessary to the decision in *Bradley* precisely because the communications at issue were made by and to strangers to the lawsuit, were not reasonably related to the action, and consequently were unprivileged under traditional criteria. (*Id.* at p. 217; cf. *Susan A.* v. *County of Sonoma, supra,* 2 Cal.App.4th at p. 95, fn. 6.) The court observed that "republications to nonparticipants in the action are generally not privileged under section [47, subdivision (b)], and are thus actionable unless privileged on some other basis." (50 Cal.3d at p. 219.)

Relying upon the statement in *Silberg* that statements to nonparticipants in litigation are not covered by the litigation privilege, the Court of Appeal in *Susan A.* v. *County of Sonoma, supra,* 2 Cal.App.4th 88, rejected a claim that certain communications made to the general public during ongoing litigation were shielded by the litigation privilege. In *Susan A.,* a psychologist interviewed a 14-year-old boy who was accused of attempted murder, and thereafter made statements about the boy to the press. The boy's parents sued. (*Id.* at pp. 92-93.) Citing *Silberg, Washer* and *Bradley,* the *Susan A.* court concluded the challenged statements were not covered by the litigation

privilege. (*Id.* at pp. 93-96.) The court reached this conclusion despite a claim that the communication was made with an intent of achieving an advantage in litigation. (*Id.* at p. 95.) The court concluded that application of the privilege to the otherwise unprivileged communication on that ground would " 'open the door to the universally condemned "trial by press" ' " (*Ibid.*, quoting from *Kennedy* v. *Cannon* (1962) 229 Md. 92 [182 A.2d 54, 59]) and would also contravene the rule stated in *Silberg* that application of the litigation privilege does not depend upon the speaker's motives, morals, ethics, or intent. (2 Cal.App.4th at p. 96.)

Based upon the foregoing authorities and the policies underlying the litigation privilege, we now must determine whether application of the privilege to the statements at issue in this case is required or justified.[3]

---

[3]In Rothman's briefs, he cited an additional recent appellate court decision, *Shahvar* v. *Superior Court* (1994) 25 Cal.App.4th 653 [30 Cal.Rptr.2d 597], in support of his claims. However, during the pendency of this appeal, the Legislature passed, and the Governor signed into law, Senate Bill No. 1540 (Stats. 1996, ch. 1055, hereafter Senate Bill No. 1540), which was enacted with the express intent of abrogating that decision. (Sen. Bill No. 1540, § 1.) In *Shahvar, supra*, a lawyer faxed a copy of a civil complaint to a newspaper, which thereafter published the charges made in the complaint. (25 Cal.App.4th at p. 656.) In the defendant's cross-complaint for defamation, the *Shahvar* court concluded the lawyer's conduct was not privileged under section 47, subdivision (b). (25 Cal.App.4th at p. 659.) In response, in Senate Bill No. 1540, the Legislature amended section 47, subdivision (*d*), effective January 1, 1997, to provide a privilege for "a fair and true report in, *or a communication to*, a public journal" (italics added) of judicial and other proceedings. The privilege in section 47, subdivision (d) has previously applied only to reports *in* public journals, not communications *to* them.

The amended statute provides in pertinent part as follows: "A privileged publication or broadcast is one made: [¶] . . . [¶] (d)(1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued. [¶] (2) Nothing in paragraph (1) shall make privileged any communication to a public journal that does any of the following: [¶] (A) Violates Rule 5-120 of the State Bar Rules of Professional Conduct. [¶] (B) Breaches a court order. [¶] (C) Violates any requirement of confidentiality imposed by law."

While the enactment of Senate Bill No. 1540 merits parenthetical mention in this opinion, the new legislation has no practical application to this case, because—quite apart from any question of whether the amendment should apply retrospectively—Senate Bill No. 1540 purports to apply only to fair and true reports or communications of judicial, legislative or other public or official proceedings, statements made in the course of such proceedings, and verified charges to a public official, which have been validated by the issuance of a warrant. The statements at issue in this case simply make assertions which the defendants claim they intended in good faith to make again later, in *anticipated* litigation. Obviously, the statements are not reports or communications of judicial proceedings. Nor could the defendants' *responses* to the leaked child abuse report conceivably be viewed as a report or communication of the charges made in that report, or be protected as such.

In a supplemental brief filed shortly after the final passage of Senate Bill No. 1540, Jackson argued that, by enacting the amended statute, the Legislature weighed in on the issue before this court, determined that statements like those alleged in this case are absolutely privileged,

### 3. *Application of the Litigation Privilege in This Case*

██ As noted above, a communication is privileged under section 47, subdivision (b) if made in, or in anticipation of, litigation by litigants or other authorized participants to achieve the objects of the litigation, and if the communication has some connection or logical relation to the action. (*Moore* v. *Conliffe, supra,* 7 Cal.4th at p. 641; *Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 212; *Albertson* v. *Raboff, supra,* 46 Cal.2d at pp. 380-381.) The communications at issue here were obviously made in anticipation of litigation—indeed, of a potential criminal prosecution—and were made by potential participants. However, we cannot agree with the defendants' claims that their charges against Rothman had the requisite "logical relation" with the subsequent litigation and were made to achieve the objects of the litigation simply because the statements concerned the subject matter of the litigation and were intended to vindicate Jackson in the forum of public opinion, just as the defendants ultimately intended to vindicate him in court.

We consider first the defendants' claim that their statements bore the requisite "logical relation" to the anticipated litigation because they concerned its subject matter. While a "logical relation" certainly exists between court pleadings and out-of-court statements that include identical or similar allegations, a "logical relation" of this kind is not sufficient to invoke the litigation privilege.[4] This conclusion finds support in two pronouncements by the Supreme Court: (1) dictum in *Silberg* v. *Anderson, supra,* 50 Cal.3d 205 that "republications [of 'injurious publications during litigation'] are generally not privileged under section [47, subdivision (b)]" (*id.* at p. 219), and (2) the holding in *Washer* v. *Bank of America, supra,* 21 Cal.2d 822 that the litigation privilege did not cover a bank vice-president's statements to the press concerning the reasons the bank had discharged the plaintiff,

and abrogated all of the judicial authorities relied upon by Rothman. This claim is overstated if not entirely wrong. In an early version of the bill, section 1 recited that the bill was intended to abrogate both *Shahvar* v. *Superior Court, supra,* 25 Cal.App.4th 653 and *Susan A.* v. *County of Sonoma, supra,* 2 Cal.App.4th 88. (Assem. Amend. to Sen. Bill No. 1540 (1995-1996 Reg. Sess.) June 13, 1996.) The reference to *Susan A.,* however, was deleted in the bill as finally approved, making clear that the Legislature expressly considered, and expressly rejected, any abrogation of the rule stated in *Susan A.*

[4]Substantial time and effort were expended during oral argument and in the parties' briefs disputing whether the defendants' charges against Rothman and his clients concerned the same subject matter as the original charges against Jackson. The parties agreed that a simple denial of the original charges would concern the same subject matter; they disagreed on whether the defendants crossed the subject matter boundary when they countercharged that Jackson's accusers were liars, and indeed went beyond that charge and specifically accused Rothman and his clients of savaging Jackson in order to extort money from him. Ultimately, however, this is a hair which does not need to be split, because, as we shall explain, the "logical relation" that must exist between litigation and communications covered by the litigation privilege is not simply one of subject matter, but includes, in addition, a *functional* connection between the litigation and the communicative act.

although the discharge (and, necessarily, its reasons) were the subject of quasi-judicial proceedings before the National Labor Relations Board. (See *Washer, supra,* 21 Cal.2d at pp. 824, 831-832.)

An analysis of the policies which underlie the litigation privilege also compel our conclusion that similarity, or even identity, of subject matter is not a "connection or logical relation" between litigation and a communication which is alone sufficient to trigger the litigation privilege. ▪ The purposes of section 47, subdivision (b)(2) were summarized in *Silberg* v. *Anderson, supra,* 50 Cal.3d 205: ". . . ensuring free access to the courts, promoting complete and truthful testimony, encouraging zealous advocacy, giving finality to judgments, and avoiding unending litigation. . . ." *(Id.* at p. 214; see also *Moore* v. *Conliffe, supra,* 7 Cal.4th at pp. 643-644; *Rubin* v. *Green, supra,* 4 Cal.4th at p. 1194; *Ribas* v. *Clark, supra,* 38 Cal.3d at pp. 364-365; *Albertson* v. *Raboff, supra,* 46 Cal.2d at p. 380.) The principal purpose of the privilege is to afford the utmost freedom of access to the courts without fear of being subsequently harassed by derivative tort actions. *(Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 213.)

Because this is so, it follows that the "connection or logical relation" which a communication must bear to litigation in order for the privilege to apply, is a *functional* connection. That is to say, the *communicative act*—be it a document filed with the court, a letter between counsel or an oral statement—must function as a necessary or useful step in the litigation process and must serve its purposes. This is a very different thing from saying that the communication's *content* need only be related in some way to the subject matter of the litigation; it is another way of saying what the Supreme Court stated in *Silberg, supra,* about the relationship between the "furtherance" and the "connection or logical relation" prongs of the four-part *Silberg* test—that the former is "simply part of" the latter. (50 Cal.3d at pp. 219-220.) The litigation privilege exists so that persons who have been harmed or have other grievances calling for redress through the judicial processes can and will use the courts, rather than self-help, to obtain relief. The privilege thus affords its extraordinary protection to the uninhibited airing, discussion and resolution of disputes *in, and only in, judicial or quasi-judicial arenas.* Public mudslinging, while a less physically destructive form of self-help than a public brawl, is nevertheless one of the kinds of unregulated and harmful feuding that courts and their processes exist to prevent. It would be counterproductive to afford to it the same protections which section 47, subdivision (b) gives to court processes.

The question of whether the litigation privilege should, or should not, apply to particular communications has always depended upon a balancing

of the public interests served by the privilege against the important private interests which it sacrifices. As the Supreme Court observed in *Silberg, supra*, "The salutary policy reasons for an absolute privilege supersede individual litigants' interests in recovering damages for injurious publications made during the course of judicial proceedings. [¶] We recognize, as have applicable precedents, that the disallowance of derivative tort actions based on communications of participants in an earlier action necessarily results in some real injuries that go uncompensated. But . . . that is the ' "price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say." ' " (50 Cal.3d at p. 218.) The balance is reversed, however, respecting actions for malicious prosecution, as the Supreme Court has also discussed on several occasions: "Malicious prosecution actions are permitted because '[t]he policy of encouraging free access to the courts [that underlies the litigation privilege] . . . is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied.' " (*Id.* at p. 216, quoting from *Albertson* v. *Raboff, supra*, 46 Cal.2d at p. 382; see also *Crowley* v. *Katleman* (1994) 8 Cal.4th 666, 695 [34 Cal.Rptr.2d 386, 881 P.2d 1083].) This same balancing of interests also disfavors application of the litigation privilege to spiteful and harmful slurs made outside of the precincts which the privilege exists to shelter.

The defendants contend, however, that their statements about Rothman were made, in the words of the *Albertson* court, "to achieve the objects of the litigation"; thus, like their anticipated defense in the expected lawsuit, their out-of-court statements were intended to vindicate Jackson. In so arguing, the defendants read the phrase "objects of the litigation" far too broadly. It has previously been held that the "furtherance" test is not satisfied merely because a communication was made with an intent of achieving an advantage in litigation (*Susan A.* v. *County of Sonoma, supra*, 2 Cal.App.4th at p. 95); application of the privilege to an otherwise unprivileged communication on this ground would contravene the rule that application of the privilege does not depend upon the speaker's motives, morals, ethics, or intent. (*Id.* at p. 96.) It follows that the test likewise cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation; and this is the most which can be said of Jackson's interest in being vindicated of the charges made by the C's.

While a person's motives for litigating a dispute may include a desire to be vindicated in the eyes of the world—a result which the litigation may achieve—this is not what is meant by the term "objects of the litigation." A party's legitimate objectives *in* the litigation are limited to the remedies

which can be awarded by courts. Thus, the "objects of the litigation" for a plaintiff are to obtain a monetary recovery for damages or other relief; a defendant's "objects" are to resist a determination of liability and whatever assessment of damages, penalty or other order that the plaintiff seeks. Thus, either party's understandable desire (or motive) for vindication—particularly where such vindication is sought outside of the litigation context—is not an "object of litigation," which satisfies the "furtherance" requirement.

Stated another way, if *Silberg*'s "furtherance" test is to serve its purpose, the test can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case. ■ A party's pleadings obviously satisfy this test. The Supreme Court has also held that the test is satisfied by a lis pendens, which functions to preserve assets which are the subject of litigation by giving constructive notice of the litigation to any potential purchasers of the asset. (*Albertson* v. *Raboff, supra*, 46 Cal.2d at p. 381.) Likewise, the test is satisfied by demand letters and like communications between litigants or their attorneys which are directed toward settlement of a pending or anticipated lawsuit (see, e.g., *Passman* v. *Torkan* (1995) 34 Cal.App.4th 607, 615 [40 Cal.Rptr.2d 291]; *Costa* v. *Superior Court* (1984) 157 Cal.App.3d 673, 678 [204 Cal.Rptr. 1]; *Izzi* v. *Rellas* (1980) 104 Cal.App.3d 254, 266-267 [163 Cal.Rptr. 689]; *Lerette* v. *Dean Witter Organization, Inc., supra*, 60 Cal.App.3d 573, 577-578); communications between a law firm and persons with potential claims, seeking support for the filing of a claim or action (*Rubin* v. *Green, supra*, 4 Cal.4th at p. 1195; *Dove Audio, Inc.* v. *Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 781-783 [54 Cal.Rptr.2d 830]); and investigatory interviews with private individuals preparatory to a hearing (*Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861, 866 [100 Cal.Rptr. 656]).

■ The defendants have suggested no way in which the purposes of the litigation privilege are furthered by extending it to press conferences and press releases. Lawyers are not prevented from the most zealous advocacy for their clients by a wholesome rule which precludes the *privileged* vilification of opponents on the public stage—in this case, on a world stage. Such a rule does not stop lawyers from insisting in public that their clients are innocent of charges made by opponents. Indeed, under the policy choice that is implicit in the litigation privilege, *no* inhibitions are imposed upon the rhetoric an attorney may use *in official court papers, pleadings and arguments*. However, as the Court of Appeal concluded in *Bradley, supra*, attorneys who wish to litigate their cases in the press do so at their own risk—that is to say, protected by the First Amendment to the United States

Constitution and all principles which protect speech and expression generally, but without the mantle of an *absolute* immunity.[5]

In sum, we hold that the litigation privilege should not be extended to "litigating in the press." Such an extension would not serve the purposes of the privilege; indeed, it would serve no purpose but to provide immunity to those who would inflict upon our system of justice the damage which litigating in the press generally causes: poisoning of jury pools and bringing disrepute upon both the judiciary and the bar.[6]

In this regard, we are frankly astonished by the contention made by Fields that celebrities and their lawyers *must* litigate their cases in the press because the public *expects* it. Fields argues that, because of such public expectations, "media attention becomes part of the forum of litigation . . . ," and to deny celebrity litigants protection for statements made in this "forum" would contravene the policies of the litigation privilege. We expressly reject this argument.

---

[5]Thus, we find unpersuasive a contention made by Fields that rule 5-120(C) of the Rules of Professional Conduct of the State Bar supports the existence of a privilege for an attorney to make the public statements which were made in this case. That rule permits a State Bar member to "make a statement that a reasonable member would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the member or the member's client." The effect of this rule is to ensure that statements made within its confines will not subject an attorney to charges of professional misconduct. However, the rule does not provide, or even imply, that defamatory statements made by attorneys in extrajudicial statements in defense of their clients should be privileged and thus not subject to redress in a court of law.

This conclusion is not altered by the amendment of section 47, subdivision (d) by Senate Bill No. 1540. (See fn. 3, *ante*), which includes in paragraph 2 of the amended subdivision the provision that a statement which violates Rules of Professional Conduct, rule 5-120 will *not* be protected by the privilege provided in paragraph 1. It does not follow that a statement which does *not* violate rule 5-120 automatically will be covered by the privilege; certainly, nothing in the amended section 47, subdivision (d) suggests that compliance with rule 5-120 brings a statement within the protection of the absolute privilege of section 47, subdivision (b).

[6]In *Susan A.* v. *County of Sonoma, supra,* 2 Cal.App.4th 88, the court noted that "trial by press" is a "universally condemned" practice (*Id.* at p. 95) and observed parenthetically that courts and commentators generally agree that the absolute litigation privilege does not protect statements made to the media. (*Id.* at p. 96, fn. 7.) These observations by the *Susan A.* court are confirmed by our review of authorities from other jurisdictions which were cited by the parties or discovered through our independent research. The defendants cite several California and out-of-state authorities which they contend support a contrary position. However, most of those cases concern statements to the public or the press by district attorneys and other public officials. Such statements are protected in California by the "official duty" privilege (§ 47, subd. (a)), which applies to a broader class of communications than the litigation privilege. Because a public official's duty includes the duty to keep the public informed of his or her management of the public business, press releases, press conferences and other public statements by such officials are covered by the "official duty" privilege, although similar statements by private litigants are not covered by the litigation privilege. (*Kilgore* v. *Younger* (1982) 30 Cal.3d 770, 779-780 [180 Cal.Rptr. 657, 640 P.2d 793].)

Jackson does argue with some justification that a public figure who is publicly accused of crime is in an extremely precarious position and should have the right to defend his good name without fear of derivative lawsuits. ■ However, as the United States Supreme Court has stated in a different, but related context, public figures, for the most part, have intentionally stepped into the limelight and "invite[d] attention and comment." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 345 [41 L.Ed.2d 789, 808, 94 S.Ct. 2997].) Consequently, the high court has held that ". . . the communications media are entitled to act on the assumption that . . . public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood . . . ." (*Ibid.*) The *Gertz* court also observed that ". . . public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." (*Id.* at p. 344 [41 L.Ed.2d at p. 808].) Because public figures have, in effect, assumed the risk of public comment, and because their prominence affords them greater opportunities to counteract falsehoods than are available to private citizens, the Supreme Court has held that public figures can recover damages for defamatory publications only upon a showing that a defamation was made with malice. (*Id.* at p. 342 [41 L.Ed.2d at pp. 806-807]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707, 84 S.Ct. 710].) ■ It would be anomalous if a celebrity's intentional and successful pursuit of public attention, which justifies affording him diminished protection from defamatory attacks, at the same time justified a license for the celebrity to use his extraordinary access to public attention to go beyond exercising his clear right to plead his own innocence, and to vilify others, including private parties, who may be less able to attract an audience interested in their defenses.

Indeed, the risk that a celebrity might act in this way presents a persuasive reason for *not* sheltering statements to the media under the wings of the litigation privilege. It would seriously impair the willingness of ordinary citizens to take on celebrities in court, and it would just as seriously impair a noncelebrity's ability to obtain legal representation in a dispute against a celebrity, if the litigation process could be expected to expose the noncelebrity and his or her attorney, not only to the stresses and sacrifices of privacy which are ordinarily entailed in litigation, but also to unrestrained and unrecompensable libel in the newspapers, on radio and on television. In this way, extending the litigation privilege to press releases and similar public statements would threaten that free and unintimidated access to the courts which the privilege is meant to protect.

Finally, the defendants argue that not all statements to the media are necessarily unconnected to the litigation, or made to *persons* unconnected to

the litigation. Granted, circumstances can be imagined in which a publication or other communication enterprise is a participant in particular litigation, or the litigation sufficiently impacts the entire audience of, for example, a trade journal or other highly specialized publication that a statement to that publication or enterprise may qualify for the privilege. However, in this case, Rothman has alleged that he was charged with the crime of extortion before "the assembled media corps," and the charge was transmitted to "others throughout the world," based upon his representation of a private client seeking tort damages for private wrongs. Rothman's allegations charge plainly enough that the challenged publication was to persons who—however curious they might be about unsavory allegations concerning the private life of a particular celebrity—have no legitimate connection with any litigation which could be anticipated between Rothman's clients and the defendants. The litigation privilege thus does not apply to the statements made in this case. If the defendants made the alleged statements, they did so at their own risk. The judgment must be reversed and the matter remanded for a determination of the other issues raised by the defendants' demurrers.

## DISPOSITION

The judgment of dismissal is reversed. The matter is remanded for further proceedings consistent with the views expressed herein. Costs on appeal are awarded to Rothman.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied October 31, 1996, and respondents' petitions for review by the Supreme Court were denied December 18, 1996.