Filed 2/11/21  Dimagiba v. L1 Technologies, Inc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JASMINE DIMAGIBA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> L1 TECHNOLOGIES, INC., et al., <br><br> Defendants and Appellants. | D076007 <br><br><br> (Super. Ct. No. 37-2018-00009416-CU-OE-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

Zfaty | Burns, Isaac R. Zfaty and Ryan N. Burns for Defendants and Appellants.

Gruenberg Law, Joshua D. Gruenberg; Williams Iagmin and Jon R. Williams for Plaintiff and Respondent.


I.

INTRODUCTION

Defendants L1 Technologies, Inc. (L1 Technologies) and Brian Verdugo (jointly "the defendants"), appeal from the trial court's denial of their motion

under Code of Civil Procedure section 425.16[1] to strike claims brought against them by plaintiff Jasmine Dimagiba.

Dimagiba was employed as an administrative assistant at L1 Technologies. During the course of her employment, she obtained counsel and filed a lawsuit against L1 Technologies and her direct supervisor, Verdugo, alleging, among other things, causes of action for sexual harassment, retaliation, and intentional infliction of emotional distress. While the lawsuit was pending, Dimagiba continued working at L1 Technologies for a period of time, but eventually decided to resign.

An individual from L1 Technologies's human resources department conducted an "exit interview" with Dimagiba, during which Dimagiba was asked to sign various documents in order to complete and terminate her employment with the company. Despite knowing that Dimagiba was represented by counsel, the human resources representative allegedly included in the exit paperwork a document titled "Employment Release Agreement" (Release Agreement) that contained a paragraph purporting to waive all of Dimagiba's claims against the company and its employees (Release Agreement).[2] The human resources representative did not notify

---

[1]  Further statutory references are to the Code of Civil Procedure unless otherwise indicated. Section 425.16 is commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[2]  The allegations of the operative pleading, as well as the declaration submitted in support of Dimagiba's opposition to the defendants' anti-SLAPP motion, leave open the possibility that someone at L1 Technologies may have forged her signature on the Release Agreement. Thus, the allegations provide for the possibility that Dimagiba did not actually sign the Release Agreement, but also permit an inference that she unwittingly signed the

Dimagiba about the presence of the release provision in one of the documents that she presented to Dimagiba for her signature, nor did she notify Dimagiba that she could speak with her attorneys or have them review the documents before Dimagiba signed them. Dimagiba signed all of the documents that the human resources representative placed before her during the exit interview, completed the interview, and received her final paycheck before leaving the company's premises.

Later that day, L1 Technologies's counsel transmitted a copy of the document that contained the release language, apparently signed by Dimagiba, to Dimagiba's attorneys, and asserted that Dimagiba had waived all of the claims that she had raised in her pending lawsuit against the company and Verdugo. In response, Dimagiba amended her complaint to include new causes of action for rescission and fraud, among others, arising from the circumstances under which Dimagiba's signature was placed on the Release Agreement.

L1 Technologies filed an anti-SLAPP motion, asserting that the new claims in Dimagiba's amended complaint, all of which pertain to Dimagiba's signing the Release Agreement, arose from protected activity—i.e., Dimagiba's preexisting employment lawsuit, and further asserting that Dimagiba could not demonstrate a likelihood that she would prevail on those newly-pled claims.

The trial court denied L1 Technologies's anti-SLAPP motion, concluding that although Dimagiba's newly-pled claims arguably arose out of protected activity, Dimagiba had nevertheless presented sufficient evidence to demonstrate a likelihood of prevailing on her claims.

_____

Release Agreement during the course of the exit interview as a result of the human resources officer's misrepresentations or material omissions.

3

On appeal, the defendants contend that Dimagiba failed to meet her evidentiary burden to demonstrate a probability of prevailing on the merits of her new causes of action attacking the Release Agreement. Specifically, the defendants contend that Dimagiba's personal declaration is insufficient to demonstrate a probability of success on the merits, and also contend that the litigation privilege provides a complete defense to Dimagiba's newly-pled claims.

We affirm the trial court's order denying the defendants' anti-SLAPP motion. Dimagiba has met her evidentiary burden in response to defendants' anti-SLAPP motion to demonstrate a probability of prevailing on the new claims, and the litigation privilege does not apply to permit the defendants to escape liability for the conduct that Dimagiba alleges.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

Dimagiba began working as an administrative assistant at L1 Technologies in April 2017. In this role, Dimagiba worked exclusively for Verdugo, the company's founder and President.

According to the allegations of the operative pleading, soon after Dimagiba began working at L1 Technologies, she was subjected to unwanted and severe sexual harassment from Verdugo. Dimagiba asserts that she was subjected to sexual harassment that included Verdugo publicly rating women he observed on a scale of "1 to 10"; asking her to tell him who her sexual

---

[3]    Because we are reviewing an appeal from the trial court's order denying the defendants' anti-SLAPP motion targeting the operative complaint, we must "accept[ ] the plaintiff's evidence as true" (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater*)). We therefore present the underlying facts in the light most favorable to Dimagiba's evidence, but acknowledge that the parties dispute what actually occurred.

4

partners were; insinuating that she engaged in sexual conduct with her coworkers; cornering her in his office and telling her that if she wanted an office affair, she should go "all in" and give him "all he wants"; and smacking her legs and arms with a long straw while saying, " '[Y]ou've been a bad girl. Bad, bad girl.' " Dimagiba alleges that when she tried to grab the straw away from Verdugo, he placed it on his crotch and told her to "go ahead and grab it."

Dimagiba alleges that she attempted to address and stop the harassment, both informally and formally, but Verdugo's behavior did not change. After Dimagiba relayed her complaints to the human resources department at L1 Technologies, she was reminded that she had signed a nondisclosure agreement (NDA), and was told that the NDA prevented her from discussing her allegations of harassment with "anyone." Dimagiba was also asked what her " 'end game' " was. Dimagiba was told that an investigation would take place, but that the investigation "would result in a decision on whether [Dimagiba] c[ould] remain employed with Defendant L1 Technologies or not." Dimagiba further alleges that during the course of the investigation, she was retaliated against in various ways, including by having her responsibilities reduced, being given "boring, mind-numbing, and monotonous" assignments, and not receiving a raise and health insurance that had been promised to her a month prior to her complaints.

Dimagiba filed an action against L1 Technologies and Verdugo on February 23, 2018, in which she asserted claims for sexual harassment, retaliation, and intentional infliction of emotional distress, among others. Dimagiba continued working at L1 Technologies after the filing of her complaint. However, because of the retaliation that she suffered, she decided to leave her job at the company in July 2018. Dimagiba informed the human

5

resources department at L1 Technologies that she would resign, effective July 3, 2018.

On her final day of employment, Dimagiba met with L1 Technologies's Vice President of Operations, Cassandra Huffman ("Huffman"), to complete and sign a "packet" of exit paperwork that Huffman had brought to the meeting. During the course of the meeting, Huffman asked Dimagiba to sign multiple documents, including Dimagiba's final timecard, a final paycheck receipt acknowledgement, and a further acknowledgment that Dimagiba had returned all company property that had been in her possession, among others.

According to Dimagiba, at no time during the meeting did Huffman indicate that one of the forms that she had brought to the meeting and was asking Dimagiba to sign was a document that purported to release any and all claims that Dimagiba had against L1 Technologies. Huffman did not discuss the nature of the Release Agreement with Dimagiba or indicate that Dimagiba could or should discuss that document with the attorneys who were representing her in the employment lawsuit that she had initiated against the company. Dimagiba was not provided the opportunity to consult with her attorneys before signing the documents. Huffman simply told Dimagiba that she must sign all of the documents in the "packet" of "exit paperwork" before she could receive her final paycheck. After Dimagiba signed the documents, Huffman left the room to make copies and returned with a set of documents that Huffman represented to be copies of the documents that Dimagiba had just signed. Huffman gave the copies to Dimagiba. At that point, the meeting concluded and Dimagiba left L1 Technologies's premises.

Later that day, counsel for L1 Technologies sent a copy of a document that contained the Release Agreement to Dimagiba's attorneys, contending

that the Release Agreement had been executed by Dimagiba. The Release Agreement stated that it released the defendants "from any and all claims, known and unknown, asserted or unasserted, which the Employee has or may have as of the date of execution of this agreement." Counsel for L1 Technologies asserted that because the Release Agreement released the defendants from any and all claims that Dimagiba had against the company, by signing the document, Dimagiba had waived the claims that she had raised in her pending employment lawsuit.

The Release Agreement document includes at least 12 paragraphs, the first 7 of which include no language at all indicating that the document would release an employee's pending claims against L1 Technologies. For example, the first few paragraphs include an employee "affirm[ance]" that he or she has been paid all compensation and provided all leave to which the employee was entitled, as well as a similar "affirm[ance]" that the employee "has not divulged any proprietary or confidential information of Company and will continue to maintain the confidentiality of such information . . . ." The document also contains language that the "[e]mployee shall not apply in the future for employment with Company because of, among other things, irreconcilable differences with the Company," and another paragraph in which the "[e]mployee affirms that [e]mployee has returned all of Company's property, documents and/or any confidential information in [e]mployee's possession or control." Tucked in the middle of the singled spaced, small typeface document, in the eighth paragraph, is the only indication that the document includes language that would release an employee's claims of wrongdoing against the company and its employees. The "release" language comprises a single paragraph, which is followed by four paragraphs of general contract language, such as a choice-of-law provision, and a paragraph

7

stating that the "agreement may not be modified, altered or changed except in writing . . . ." The language stating that the employee releases any and all claims against the company is not highlighted, set apart, or otherwise stylistically prominent in the document, but instead, is placed in the middle of a full page of small text that addresses other subjects.

Dimagiba attested that when shown the Release Agreement by her attorneys, she did not recognize it and had no recollection of having executed it while signing the packet of documents that Huffman presented to her and asked her to sign during her exit interview. When Dimagiba later reviewed the packet of documents that Huffman had given her, Dimagiba did not find a copy of the Release Agreement.

Dimagiba disputed the validity of the Release Agreement, as well as the validity of her signature on that document. Dimagiba attested that she had no intention of releasing the defendants from any claims, and that if she had in fact signed the document, she was not aware that the document was a Release Agreement and that it would have the effect of releasing the company and its employees from the claims in her pending lawsuit. Dimagiba also stated that she had not discussed any release of her claims with Huffman, and indicated that she had not received consideration or anything of value in exchange for signing the Release Agreement. Dimagiba noted that in the printed version of her name on the Release Agreement, below the signature line, her last name is spelled incorrectly.

According to Huffman's testimony as presented in her declaration, L1 Technologies's attorney, Patrick N. Reid ("Attorney Reid"), had given Huffman the Release Agreement "for [Dimagiba's] signature."

After L1 Technologies sent a copy of the Release Agreement to Dimagiba's attorneys and asserted that it applied to waive Dimagiba's claims

8

in the pending lawsuit, Dimagiba filed an amended pleading in which she added causes of action for declaratory relief, rescission, fraud, concealment, and misrepresentation, based on her contention that the Release Agreement was invalid.

In response to the amended pleading, L1 Technologies filed an anti-SLAPP motion, arguing that the new causes of action that Dimagiba was asserting implicated L1 Technologies's petitioning rights because the claims arose out of the ongoing judicial proceedings, i.e., Dimagiba's original employment action. L1 Technologies also asserted that Dimagiba could not demonstrate a reasonable probability of prevailing on those new claims because those claims were barred by the litigation privilege under Civil Code section 47, subdivision (b), since they dealt with communications concerning ongoing litigation and settlement between the parties.

Dimagiba opposed the anti-SLAPP motion, arguing that none of her new claims implicated L1 Technologies's petitioning rights, and that even if the claims did implicate L1 Technologies's petitioning rights, she could demonstrate with competent evidence a probability of prevailing on the challenged causes of action. Dimagiba also asserted that the litigation privilege did not apply to bar her new claims, and that the basis for her claims was L1 Technologies's fraudulent conduct.

After full briefing, the trial court denied the defendants' anti-SLAPP motion. With respect to the first prong of the anti-SLAPP motion analysis, the court concluded that Dimagiba's newly asserted claims arose out of protected activity because they were tied to the underlying lawsuit. As to the second prong, the trial court concluded that Dimagiba had made a sufficient evidentiary showing of a likelihood of prevailing on her newly pled claims challenging the validity of the Release Agreement. The trial court stated:

9

"The [evidence as presented by Dimagiba leaves open] the possibility that unethical conduct may have occurred here. Essentially defendants are asserting that three months after they filed their initial answer in this case [citation], they handed plaintiff a release agreement that had been supplied in advance by their attorney, and plaintiff then proceeded to give up her rights to prosecute this lawsuit in exchange for half a day's pay. Ordinarily, when pending litigation is resolved and both sides have counsel (as here), the lawyers for both sides approve the settlement documentation as to form and the process takes place in an above-board fashion. A review of Huffman's declaration reveals no suggestion that she recommended Ms. Di[m]agiba have the document reviewed by her counsel before she signed it. It would have been simple for her to have done so."

The trial court concluded that "a more complete factual development is necessary, and plaintiff has shown the 'minimal merit' necessary to proceed with her claims." The court rejected the defendants' assertion that the litigation privilege provided a complete defense to the challenged claims.

The defendants filed a timely appeal from the court's order denying their anti-SLAPP motion.

III.

DISCUSSION

A. *Relevant anti-SLAPP standards*

The anti-SLAPP statute requires a two-step analysis. First, the defendant must establish that the challenged claim arises from his or her act in furtherance of the " 'right of petition or free speech under the [federal or state] Constitution in connection with a public issue . . . .' (§ 425.16, subd. (b)(1).) 'The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims

10

arising from protected activity.' " (*Sweetwater*, *supra*, 6 Cal.5th at p. 940.) " 'If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.  We have described this second step as a "summary-judgment-like procedure."  [Citation.]  The court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.  [Citation.]  "[C]laims with the requisite minimal merit may proceed." ' " (*Ibid.*)

We review the trial court's rulings on an anti-SLAPP motion de novo. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)  "In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted." (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1652.)  In reviewing a ruling on an anti-SLAPP motion, we "may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial." (*Sweetwater*, *supra*, 6 Cal.5th at p. 949; § 425.16, subd. (b)(2) [courts consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based"].)  Further, we "must draw 'every legitimate favorable inference' from the [anti-SLAPP] plaintiff's evidence." (*Cuevas-Martinez v. Sun Salt Sand* (2019) 35 Cal.App.5th 1109, 1117 (*Cuevas-Martinez*).)

11

B. *Dimagiba presented sufficient evidence to satisfy her burden to demonstrate a probability of prevailing on the challenged claims*

On appeal, the parties appear to agree that the relevant question is whether Dimagiba made a sufficient prima facie factual showing to support a judgment in her favor on the challenged causes of action.[4]

With respect to the second prong of the anti-SLAPP analysis, a plaintiff need only produce evidence that establishes a prima facie case. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) As the defendants concede, at this stage of the proceedings the court does not judge credibility or evaluate the weight of the evidence produced by Dimagiba. (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.) Rather, the trial court is to accept as true all evidence favorable to Dimagiba and to assess the defendants' evidence only to determine if it defeats Dimagiba's submission as a matter of law. (See *ibid.*)

That showing is satisfied "if it is reasonably possible the evidence set out in supporting affidavits, declarations or their equivalent will be admissible at trial." (*Sweetwater*, *supra*, 6 Cal.5th at p. 947.)

---

[4] In briefing on appeal, Dimagiba "does not concede that the gravamen of the claims contained in her [operative pleading] necessarily implicate protected activity under the anti-SLAPP statute." However, she states that she is "not challeng[ing] that finding by the trial court here, either by way of a cross-appeal or pursuant to Code of Civil Procedure 906." Because we conclude that Dimagiba met her burden on the second prong of the anti-SLAPP analysis, and because the parties have not adequately briefed the first prong of the anti-SLAPP analysis, and in view of Dimagiba's position with respect to the first prong on appeal, we do not address the first prong in this opinion. However, we do not intend our silence on the matter to imply that we agree with the trial court that the challenged claims arise from protected conduct.

12

The defendants argue on appeal that "mere allegations are, as a matter of law, insufficient" to meet the plaintiff's burden in response to an anti-SLAPP motion. They further contend that while a plaintiff's evidence presented in response to an anti-SLAPP motion is to be considered akin to what would be necessary to avoid summary judgment, the trial court "appears to have analyzed the evidence under a standard more akin to a demurrer." The defendants continue, "If all it takes to defeat a Special Motion to Strike are self-serving and conclusory statements, then the second prong of the Anti-SLAPP test is rendered totally superfluous. No matter how low the bar supposedly is set for evidentiary sufficiency, the bar is not set at 'no evidence.' " It is clear that the defendants mischaracterize or misunderstand the nature of Dimagiba's evidence. The evidence that Dimagiba proffered, in the form of her own declaration, is clearly sufficient to demonstrate a probability of prevailing on her claims.

We begin with a recitation of the claims and related allegations that the defendants challenge in their anti-SLAPP motion. In the sixth cause of action (for declaratory relief), Dimagiba alleges that she did not sign the Release Agreement, or, in the event a fact-finder determines that she did sign it, her signature was procured "through fraud, misrepresentation, concealment, and undue influence," causing the Release Agreement to be "null, void, and unenforceable." Similarly, in the seventh cause of action, in which she seeks rescission of the Release Agreement, Dimagiba further alleges that Huffman intentionally concealed and misrepresented the fact that one of the documents in the packet of documents that Huffman presented to Dimagiba to sign during her exit interview was a release agreement pertaining to the claims in Dimagiba's pending lawsuit against the company. Dimagiba's eighth, ninth, and tenth causes of action (for actual

13

fraud, fraudulent concealment, and negligent misrepresentation) allege, in the alternative to the sixth and seventh causes of action, that if a fact-finder determines that Dimagiba did "validly sign[ ]" the Release Agreement, her signature was obtained through fraud, misrepresentation, concealment, or undue influence, and that Dimagiba reasonably relied on the misrepresentations, thereby entitling Dimagiba to damages, as well as punitive and exemplary damages, resulting from the defendants' wrongful acts. In her eleventh cause of action (for intentional infliction of emotional distress), Dimagiba relies on the other allegations in the amended pleading, and she alleges that the defendants' intentional conduct was extreme and outrageous and caused her to suffer extreme emotional distress.

In Dimagiba's declaration submitted in opposition to the anti-SLAPP motion, Dimagiba attested to the following relevant facts, based on her personal knowledge:

> (1) On her final day of employment, July 3, 2018, Dimagiba met with Huffman in order to complete exit paperwork.

> (2) Huffman asked Dimagiba "to sign a few forms," which included Dimagiba's final timecard, a final paycheck acknowledgement, and an acknowledgment that Dimagiba had returned all company property, among other documents.

> (3) Huffman did not, at any point during the meeting, indicate that the forms included a document purporting to release Dimagiba's claims in her pending lawsuit against the defendants.

> (4) Huffman never indicated to Dimagiba that she could or should discuss any of the documents with her attorneys before signing, and Huffman did not provide Dimagiba an opportunity to do so.

14

(5) During the exit meeting, Dimagiba and Huffman did not engage in discussions or negotiations regarding Dimagiba's pending lawsuit against L1 Technologies and Verdugo, or regarding any potential payments to her.

(6) Huffman told Dimagiba that she would make copies of the signed forms, and left the room. Upon returning, Huffman handed Dimagiba a packet of documents purporting to be a copy of the documents that Dimagiba had signed. Dimagiba then left L1 Technologies's premises.

(7) Dimagiba left L1 Technologies's premises approximately two hours before the end of a normal full day of work. L1 Technologies paid Dimagiba for a full day on her last day of employment. However, she did not receive anything of value from either L1 Technologies or Verdugo in exchange for signing the packet of documents presented to her by Huffman.

(8) After L1 Technologies's attorneys provided Dimagiba's attorneys with a copy of the Release Agreement, Dimagiba reviewed the document. Dimagiba did not recognize the Release Agreement as one of the documents that she had signed on July 3, 2018. Dimagiba noticed that in the printed version of her name, under where her purported signature appears in the Release Agreement, her last name is misspelled.

(9) When Dimagiba "later reviewed the packet of documents that Huffman [had] provided [her]," she could not find a copy of "the purported Employment Release Agreement."

(10) Dimagiba has no memory of signing the Release Agreement on July 3, 2018, during her exit interview.

(11) If Dimagiba did sign the Release Agreement, she did not know that it was an agreement purporting to release her pending claims against the defendants when she signed it.

(12) Dimagiba did not intend to release either L1 Technologies or Verdugo from her claims against them on July 3, 2018, when she had her exit interview. Rather, at that time, Dimagiba's attorneys were pursuing her claims in court on her behalf, and Dimagiba fully intended to pursue those claims to the fullest extent allowable by law.

If we assume that the facts as set forth by Dimagiba are true, as we must in reviewing a ruling on an anti-SLAPP motion, these facts are sufficient to establish a prima facie showing to support the challenged causes of action.

For example, with respect to Dimagiba's claim for declaratory relief, in which she asks the court to determine that the Release Agreement is "null, void, and unenforceable," Dimagiba states that she was not told that the packet of documents that she was being asked to sign included a Release Agreement, does not recall signing that document, and could not find a copy of the document in the packet provided to her that Huffman indicated contained copies of all of the documents that Dimagiba had just signed. Dimagiba further states that she at no point intended to release the claims in her pending lawsuit at the time of her exit interview, she received no consideration in exchange for signing the document that contained the Release Agreement, and she was never told that she could consult with her attorneys or provided an opportunity to do so prior to signing any of the documents. All of this occurred while Dimagiba was represented by counsel in her employment action against L1 Technologies and Verdugo, yet her counsel were not made aware that anyone at L1 Technologies was asking their client to release her claims until after she had purportedly signed the document. Based on Dimagiba's declaration, it is reasonable to infer that either the Release Agreement was not presented to Dimagiba for signature,

16

and that instead, her signature appeared on the document through nefarious means that have not yet been ascertained, or that Dimagiba was, in effect, tricked into placing her signature on the Release Agreement, such that she signed it unknowingly and involuntarily. Under either of these scenarios, the Release Agreement could not be considered valid, thereby demonstrating the merits of Dimagiba's sixth cause of action seeking a declaration that the Release Agreement is "null, void, and unenforceable."

Dimagiba's statements in her declaration also support her claims seeking rescission of the Release Agreement, and her claims for fraud, fraudulent concealment, and negligent misrepresentation. Essentially, Dimagiba's testimony concerning the circumstances by which the signed Release Agreement appears to have been procured by the defendants is more than sufficient to establish a prima facie showing on these causes of action. Further, to the extent that Dimagiba's cause of action for intentional infliction of emotional distress is dependent on the allegations supporting her sixth through tenth causes of action, Dimagiba's testimony, as presented through her declaration, is also sufficient to support this claim, particularly when paired with Huffman's own declaration in which she states that counsel for L1 Technologies told her to have Dimagiba sign the Release Agreement as part of a packet of documents that Dimagiba was to sign during her exit interview. In addition, Dimagiba's attorney's declaration attests to the fact that counsel for L1 Technologies sent Dimagiba's attorneys the Release Agreement purportedly executed by Dimagiba later on the same day as Dimagiba's exit interview at the company. The timeline of these events, as well as the fact that Huffman presented the Release Agreement to Dimagiba despite knowing that Dimagiba was represented by counsel in a pending lawsuit against L1 Technologies and Verdugo, was, at best, outside the norm,

17

as the trial court acknowledged in its order. Considered together with Dimagiba's attestations that she was unaware that she had signed any document purporting to release her pending claims and that she received nothing of value in exchange for signing such a document, one could reasonably infer that Dimagiba did not knowingly or voluntarily enter into the purported Release Agreement.[5] At a minimum, the evidence is sufficient to demonstrate a probability of success on the newly pled claims against the defendants.

The defendants contend that "mere allegations are, as a matter of law, insufficient" to meet a plaintiff's burden in response to an anti-SLAPP motion. In making this argument, defendants misapply the relevant standards. A declaration based on facts about which the declarant has personal knowledge *is* evidence, not "mere allegations," as in an unverified complaint. Dimagiba's declaration, which is based on her personal knowledge, provides support for her claims and is sufficient to meet her burden on the second prong of the anti-SLAPP analysis.

The defendants further argue that Dimagiba's declaration is insufficient to meet her burden to demonstrate a prima facie case with

---

[5] The defendants contend that Dimagiba received something of value in exchange for signing the Release Agreement in that she received payment for a full day of work on her final day, even though she left work approximately two hours before her workday would typically end. It is clear from Dimagiba's declaration that she was not told, and did not comprehend, that her being allowed to leave her employment immediately after her exit interview while being paid for a full day of work constituted an offer of something of value in exchange for releasing the claims in her pending lawsuit. The suggestion that Dimagiba would have voluntarily waived her pending claims of sexual harassment in exchange for a mere two hours of pay is implausible and provides further support for the conclusion that the defendants took advantage of the exit interview to trick Dimagiba into releasing all claims against defendants.

18

respect to each challenged cause of action. Specifically, the defendants argue that "the only evidence offered [by Dimagiba] was [Dimagiba's] self-serving, conclusory declaration" (boldface and capitalization omitted). However, again, Dimagiba's declaration, self-serving or not, is clearly evidence that, if believed, would be sufficient to establish the causes of action in the operative complaint. (See *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245–1247 [testimony of a single witness may provide substantial evidence to support findings, despite existence of countervailing evidence and testimony that could have supported contrary findings].) The fact that the declaration serves Dimagiba's interests by supporting the allegations of the operative complaint does not negate the value of that evidence for purposes of an anti-SLAPP motion. The accusation that Dimagiba's declaration is self-serving is, effectively, a challenge to the *credibility* of the declaration. However, as the defendants concede, for purposes of assessing the merits of defendants' anti-SLAPP motion, the court does not weigh the credibility of the parties' respective evidence, but instead, accepts the plaintiff's evidence as true, and draws all reasonable inferences in her favor. (*Cuevas-Martinez, supra,* 35 Cal.App.5th at p. 1117.) Thus, the fact that Dimagiba's declaration serves her interests and may be drafted in a light favorable to her and her claims does not render the declaration insufficient. Indeed, if what Dimagiba testifies to in her declaration is believed, she has set forth a narrative that supports the conclusion that something devious and unethical was afoot in her exit interview at L1 Technologies.

We also reject the defendants' suggestion that Dimagiba's declaration does not "present[ ] facts specifically articulating any fraudulent conduct." Rather, when taken as a whole, one could reasonably conclude that Huffman presented Dimagiba, who was represented by counsel at the time but who

19

was alone with Huffman for the exit interview, with a packet of documents to sign. Huffman's declaration makes clear that she knew that the packet included a document that contained the release language amid other text. Dimagiba's declaration makes clear that Huffman presented the document containing the release language to Dimagiba to sign without notifying Dimagiba of the presence of the release language in that document or informing her that she might want to consult with her attorneys before signing it. The picture that Dimagiba's declaration paints is one of scheming and chicanery, and the taking advantage of a layperson by a corporation and its counsel. If a fact-finder were to believe Dimagiba's testimony as set forth in her declaration, that testimony would be sufficient to support a judgment in her favor on her newly pled claims. Defendants' contention that Dimagiba's declaration is insufficient to support her claims seeking to invalidate the Release Agreement is baseless; defendants' counsel must surely be aware that testimony, even when provided in a declaration, constitutes evidence.

We also reject the defendants' contention that Dimagiba's declaration "conflicts with its own statements and the various evidence submitted by both parties." First, the defendants seem to suggest that Dimagiba's statements that she does not recall signing the Release agreement, or, in the alternative, "that even if she did sign it, she didn't know what she was signing" are "conflicting." However, it is entirely possible for a person to believe that she did not sign a particular document and to have no memory of doing so, and at the same time believe that if she did sign such a document, she had no appreciation of the nature of that document. Indeed, it is not unlikely that an individual might fail to remember signing a document that she unwittingly signed. The defendants suggest that Dimagiba's declaration is "conclusively

20

refuted by the existence of the document itself and [Dimagiba's] signature thereon." We disagree. Dimagiba's declaration raises serious questions about how her signature came to be on that document. There are irregularities in the document, including the misspelling of Dimagiba's last name in the printed version of her name under the signature line, and Dimagiba attests that a copy of that document was not included in the packet that Huffman provided to her that purported to be a copy of everything Dimagiba had signed during the exit interview. While it is possible that Dimagiba did sign the document, her declaration reasonably supports a conclusion that if she did sign it, she did so unwittingly during the meeting with Huffman and was unaware that the document contained a release of her claims against the defendants.

C. *The litigation privilege does not bar Dimagiba's claims*

The defendants argue that the trial court "fail[ed] to . . . consider" their litigation privilege defense, asserted under Civil Code section 47, subdivision (b). However, it is clear that the trial court did consider this asserted defense and rejected it. Specifically, the court considered the elements of a litigation privilege defense and concluded that because Dimagiba had established a prima facie case of fraud, the protections of the litigation privilege do not apply. We agree with this assessment.

The "litigation privilege" renders absolutely privileged communications that are (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. (Civ. Code, § 47, subd. (b).) "[J]udicial or quasi-judicial" proceedings are defined to include "all kinds of truth-seeking proceedings," including administrative, legislative and other official proceedings. (*Silberg v.*

21

*Anderson* (1990) 50 Cal.3d 205, 212–213 (*Silberg*).) " 'The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]' " (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment*).)

Although sometimes referred to as a broad privilege, the litigation privilege is not without limits. This is because the question of whether the litigation privilege should, or should not, apply to particular communications has always depended upon a balancing of the public interests served by the privilege against the important private interests that it sacrifices. (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1146 (*Rothman*).) For example, in *Albertson v. Raboff* (1956) 46 Cal.2d 375, the Supreme Court "did not extend the privilege to actions for malicious prosecution, explaining that '[t]he policy of encouraging free access to the courts that underlies the absolute privilege applicable in defamation actions is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied.' [Citation.]" (*Action Apartment*, *supra*, 41 Cal.4th at p. 1242.)

"Because [the main purpose of the privilege is to provide the greatest freedom of access to the courts without fear of subsequent harassment through a derivative tort action], it follows that the 'connection or logical relation' which a communication must bear to litigation in order for the privilege to apply, is a functional connection. That is to say, the communicative act—be it a document filed with the court, a letter between counsel or an oral statement—*must function as a necessary or useful step in the litigation process and must serve its purposes*. This is a very different

22

thing from saying that the communication's content need only be related in some way to the subject matter of the litigation; it is another way of saying what the Supreme Court stated in *Silberg*, *supra*, about the relationship between the 'furtherance' and the 'connection or logical relation' prongs of the four-part *Silberg* test—that the former is 'simply part of' the latter. (50 Cal.3d at pp. 219–220.) The litigation privilege exists so that persons who have been harmed or have other grievances calling for redress through the judicial processes can and will use the courts, rather than self-help, to obtain relief. The privilege thus affords its extraordinary protection to the uninhibited airing, discussion and resolution of disputes in, and only in, judicial or quasi-judicial arenas." (*Rothman*, *supra*, 49 Cal.App.4th at p. 1146, italics altered.)

The defendants contend that the litigation privilege bars Dimagiba's newly-pled claims because the Release Agreement that she purportedly signed during her exit interview operates to release Dimagiba's claims against the defendants in her pending lawsuit; thus, any communications engaged in with respect to the Release Agreement would involve that pending litigation and would therefore necessarily be privileged. Dimagiba's causes of action setting for claims for declaratory relief, rescission, and fraud, based on the alleged deceptive conduct during what she believed was merely an exit interview to conclude her employment with L1 Technologies are not based on "a communication made in judicial or quasi-judicial proceedings." Rather, according to the evidence that Dimagiba has proffered, her claims arise from the conduct of L1 Technologies's counsel and/or its human resources officer operating *outside* of any actual judicial proceeding, despite the fact that the parties were concurrently engaged in such a proceeding, by possibly attempting to trick Dimagiba into unwittingly signing away her

23

pending claims or by forging her signature on the Release Agreement. Dimagiba's allegations implicate a communication that she maintains was not made in a judicial or quasi-judicial proceeding and set forth a case of extrinsic fraud, which is not protected by the litigation privilege. (See *Silberg, supra*, 50 Cal.3d at p. 214.) " 'Fraud is extrinsic where the defrauded party was deprived of the opportunity to present his or her claim or defense to the court, that is, where he or she was kept in ignorance or in some other manner, other than from his or her own conduct, fraudulently prevented from fully participating in the proceeding.' " (*Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 26–27.) The fraud on the part of the defendants, as alleged in Dimagiba's operative pleading, is of the kind that effectively deprived her of the opportunity to understand what she was signing, and thus, to present her original claims in court. A reasonable inference from the facts set forth in Dimagiba's declaration is that the conduct engaged in by Huffman and counsel for L1 Technologies caused Dimagiba to unknowingly release the claims in her pending lawsuit.

Even if the litigation privilege did not exclude from its coverage the fraudulent conduct alleged by Dimagiba, the defendants cannot seriously contend that duping a party into signing a release agreement of which she was unaware is a "necessary or useful step in the litigation process" or serves the purposes of the litigation process. (*Rothman, supra*, 49 Cal.App.4th at p. 1146; see also *Dziubla v. Piazza* (2020) 59 Cal.App.5th 140, 156–157 [courts are "not bound to interpret 'logical relation' " in context of litigation privilege "so expansively" that court is unable to discern what is connected to or logically related to the court proceedings from what is " 'substantially extraneous' " to those proceedings].) As Dimagiba complains, the defendants' conduct here "is a brazen attempt to create an end-run around the typical

24

litigation process for asserting and ultimately resolving disputed claims through both established and ethical means."

Taking Dimagiba's allegations as true, as we must for purposes of evaluating defendants' anti-SLAPP motion, at a minimum, it would appear that the Rules of Professional conduct were breached. Specifically, Rule 2-100 of the Rules of Professional Conduct prohibits an attorney from communicating "directly or indirectly" with a represented party. The purpose of that rule is to "preserve the attorney-client relationship from an opposing attorney's intrusion and interference." (*Jackson v. Ingersoll-Rand Co.* (1996) 42 Cal.App.4th 1163, 1167.) "[A] general principle [exists] that attorneys should not advise their clients regarding party communications in a manner that violates the underlying purpose of the rule," and "preparing legally binding documents for an opposing party to sign takes advantage of the fact that the party is being contacted without knowledge, consent or presence of her legal representative." (*San Francisco Unified School Dist. ex rel. Contreras v. First Student, Inc.* (2013) 213 Cal.App.4th 1212, 1235–1236; see also California State Bar Formal Opinion No. 1993-131 (1993) ["[A]n attorney is prohibited from drafting documents, correspondence, or other written materials, to be delivered to an opposing party represented by counsel even if they are prepared at the request of the client, are conveyed by the client, and appear to be from the client rather than the attorney"].) According to Huffman's declaration, an attorney for L1 Technologies prepared the Release Agreement and provided it to Huffman with directions to have Dimagiba sign the document during her exit interview, despite the fact that L1 Technologies and its counsel were aware that Dimagiba was represented by counsel with respect to the very claims that they were attempting to have her release by signing that document. Such plainly improper and unethical communication

25

with a represented party can hardly be deemed a "necessary or useful step in the litigation process" that "serve[s] its purposes." The policies underlying the litigation privilege clearly do not support its application in these circumstances.

This court is not required to blind itself to what may be a serious fraud, and, in essence, facilitate that fraud by concluding that the litigation privilege entitles defendants to absolute immunity from liability for such alleged unethical and fraudulent conduct. We therefore reject the defendants' argument that the litigation privilege provides them a complete defense to Dimagiba's newly-pled claims and that Dimagiba therefore cannot demonstrate a probability of prevailing on her claims.

## IV.

## DISPOSITION

The order of the trial court is affirmed. Dimagiba is entitled to her costs on appeal.

AARON, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.

26