Filed 11/15/24  Art Colony Property v. Tidwell CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ART COLONY PROPERTY LLC, | B332285; B336040 |
| Plaintiff and Appellant, | Los Angeles County |
| v. | Super. Ct. No. 22STCV36753 |
| SYLVIA TIDWELL, | |
| Defendant and Respondent. | |

APPEALS from orders of the Superior Court of Los Angeles County.  Daniel M. Crowley, Judge.  Reversed.

Gibson, Dunn & Crutcher, Kahn Scolnick, Ritchie Vaughan, James P. Fogelman and Alayna Monroe for Plaintiff and Appellant.

Law Offices of Neil R. Anapol and Neil R. Anapol for Defendant and Respondent.

————————————————

**SUMMARY**

Plaintiff, the owner of residential property, brought this lawsuit alleging that defendant, a former tenant, breached her lease and intentionally interfered with plaintiff's contractual relations with 20 other tenants by encouraging them to withhold rental payments after plaintiff had legally increased rents to market rates.

Defendant responded to the complaint with a special motion to strike the intentional interference claim under the anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16; further undesignated statutory references are to this section of the Code of Civil Procedure.) Defendant contended her statements to the other tenants were in connection with pending or anticipated litigation, citing three separate, unrelated matters: the unlawful detainer actions plaintiff filed after the tenants withheld rent; a pending lawsuit that had nothing to do with rental rates; and a toxic tort lawsuit filed more than two years later that also had nothing to do with rental rates, and the basis for which was unknown at the time defendant urged the tenants not to pay rent.

The trial court granted defendant's motion, finding her statements telling tenants not to pay their rent were protected as prelitigation communications. The court concluded plaintiff could not prevail on the merits because of the litigation privilege, reasoning that "litigation was imminent when the dispute arose concerning the amount of rent" that plaintiff could charge tenants.

We conclude the trial court erred. The litigation privilege does not apply to defendant's statements urging other tenants to withhold rent because those statements were not made in

2

furtherance of defendant's objectives in the unlawful detainer action against her, and she had no litigation-related interest in the unlawful detainer actions against other tenants. The other two lawsuits concerned entirely different issues having nothing to do with rent. And defendant's statements were not protected, as she now claims, by the "catchall" provision of the statute that protects conduct "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

Because defendant's statements were not protected activity, we need not and do not consider whether plaintiff established a probability of prevailing on its intentional interference claims. We reverse the trial court's order granting defendant's anti-SLAPP motion, and likewise reverse the order awarding defendant attorney fees.

FACTS

## 1.    Background Facts

In 2018, Art Colony Property LLC (plaintiff) purchased property known as the Santa Fe Art Colony, a complex of "live/work artist spaces." Sylvia Tidwell (defendant) was a tenant and head of the Santa Fe Art Colony Tenants Association (tenant association or association).

For 30 years, the property had been subject to rent restrictions. These legal covenants expired in 2016, allowing the owner to set rents at market rates if the owner gave various statutory notice requirements specified by the Government Code. The owner had to notify tenants the rent restrictions were expiring, rents would be raised to market rates, and "qualified entities" would have the opportunity to submit a "bona fide" offer to buy the property at the "fair market value of the property's highest and best use" and maintain below-market rents. (See

3

Gov. Code, §§ 65863.10, subds. (b), (c), 65863.11, subd. (k).) The prior owner gave notice in 2016, and in October 2017 reset the rents to market rates, after which plaintiff bought the property in June 2018.

In July 2018, counsel for the tenant association alleged the notice by the prior owner did not conform to state law. Rather than dispute the claim, plaintiff reimbursed the tenants for the additional rent they had paid and reduced the rents back to the restricted affordability levels. At the same time, plaintiff delivered new notices of its intent to set rents to market rates in one year, effective November 1, 2019.

Plaintiff also gave the required notice to the tenant association of the right of qualified entities to make a bona fide offer to purchase the property. The association made an offer in April 2019 that plaintiff rejected on the ground the association was not qualified and the offer was not bona fide. On December 2, 2019, the tenant association filed a lawsuit against plaintiff to enforce the statutory right "to attempt, in good faith, to purchase the [property] and allow its tenant members to avoid rent increases imposed by Landlord . . . ."

## 2. Events in November and December 2019

During the two months after the rent increases became effective on November 1, 2019, defendant and others filed complaints about the rent increases with the Los Angeles Housing + Community Investment Department (Housing Department) and with the Housing Rights Center, a nonprofit organization that (among other things) administered an Emergency Rental Relief Program for the City of Los Angeles. Under the latter program, the city issued checks to plaintiff for the difference between the old rental rates and the rates effective

4

November 1, 2019, for defendant and other tenants who applied. This was only for the two-month period before January 1, 2020, when a statewide cap on rent increases (the Tenant Protection Act) was to (and did) go into effect.

The new state law limited the amount by which an owner could increase rent, on or after March 15, 2019, to no more than 5 percent plus the percentage change in the cost of living, or 10 percent, whichever was lower, for a 12-month period. However, this provision did not apply to "initial unassisted rental rates," which are the initial market rates that an owner may charge when affordability rental restrictions expire (such as the 30-year restrictions in this case). Thus, a newly established market rate set after March 15, 2019, was allowed under the Tenant Protection Act, and would be subject to the statute's limitation on further increases after one year.

During November 2019, plaintiff's counsel received an inquiry from a deputy city attorney in the housing division about the rent increases. The city's inquiry was generated by tenant complaints, which suggested that the increases were not authorized under the new state law. Plaintiff's counsel believed the tenants had suggested the rates had already been raised in 2017. Plaintiff's counsel explained to the city that plaintiff had rescinded the 2017 rent increases (in response to the tenant association's July 2018 demand letter), reset the rates to the prior restricted rates, refunded the increased rents that had been collected, and sent new one-year notices. After those discussions, neither the city attorney's office nor the Housing Department took any further action.

Plaintiff's counsel also received a separate inquiry from Leona Rollins, director of investigations at the Housing Rights

Center, who initially asserted that under the new state law, the tenants' rents were to be rolled back to their March 2019 levels. Plaintiff's counsel explained to her, as they had to the city attorney, that the November 1, 2019 rates were the "initial unassisted rental rates following the termination of the affordability covenants," as allowed by the new state law, and the new law did not require the rents to roll back on January 1, 2020. On November 21, 2019, Ms. Rollins responded with an e-mail stating "Yes, that is correct. We are planning to relay this information to the residents, however, the residents who are members of the [tenant association] are already in possession of email and written communication from your office confirming that their current rental rates will not roll back to the rental amounts of March 15, 2019." The Housing Rights Center took no further action.

### 3. The Unlawful Detainer Litigation

On January 1, 2020, defendant and 20 other tenants tendered only partial rent instead of the full amount. The property director, Javier Lazo, returned their rent checks, stating that the management's policy was to accept only checks in the full amount of the rent that was due.

These 21 tenants did not pay the rent due, and plaintiff filed unlawful detainer complaints against defendant and at least one other tenant on or around January 14 or 15, 2020. (The record does not disclose the filing dates of the 19 other actions, but the complaint alleged the 21 actions were filed "immediately.") These were based on a three-day notice to pay rent or quit which, in defendant's case, was served by posting a copy on the premises and mailing it on January 8, 2020.

6

As is recounted in plaintiff's complaint, after the 21 unlawful detainer actions were filed, the "COVID-19 pandemic then hit in March 2020," and because of court rules during the emergency, plaintiff "was unable to evict the breaching parties or mitigate its damages for two-and-a-half years."

In April 2021, the trial court found the 21 unlawful detainer actions were related. In May 2021, plaintiff moved for summary adjudication of the tenants' affirmative defense that "the rent was increased in excess of what is allowable under the Tenant Protection Act." The parties stipulated that the motion in the lead case would apply to all related cases in the action.

On September 8, 2021, the court (Judge Monica Bachner) granted plaintiff's motion. The court ruled that plaintiff's evidence established that the property was not subject to the Tenant Protection Act's limits, and the landlord "was entitled to establish the initial unassisted rental rate for units in the property."

In 2022, plaintiff either prevailed in or negotiated stipulated judgments and settlements of all the unlawful detainer cases, except defendant's. Plaintiff and defendant engaged in settlement discussions, and defendant vacated her unit on June 30, 2022, but no settlement was ever entered. Defendant claims the parties settled her case at a mandatory settlement conference on April 8, 2022, but on September 13, 2022, the trial court (Judge Bachner) denied defendant's motion to enforce the settlement she claims was made.

On September 15, 2022, plaintiff voluntarily dismissed the unlawful detainer action against defendant.

7

### 4. Plaintiff's Complaint

Two months later, on November 21, 2022, plaintiff filed this lawsuit against defendant and the tenant association, alleging causes of action for breach of contract (against defendant), intentional interference with contractual relations (against both), and violation of the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.) (against both). The tenant association was dismissed in January 2023 as part of the settlement of its December 2019 lawsuit to enforce its claimed right to purchase the property. (The settlement provided "no monetary payment whatsoever by either Plaintiff or Defendant.")

Plaintiff's complaint alleged that defendant registered the tenant association with the state and "used it as a vehicle to protest and intentionally hamper Plaintiff's lawful rent raises." In January 2020, defendant interfered in plaintiff's contractual relationships "by encouraging tenants to withhold rent payments to Plaintiff in order to exert leverage over Plaintiff in furtherance of [her] scheme." Because of COVID and anti-eviction laws implemented in March 2020, plaintiff was unable to evict tenants, who "lived rent-free in violation of their leases." Meanwhile, plaintiff had to incur all the costs of ownership, and was prevented from carrying out its business plans for the property, including full renovation of units to achieve higher rents. Plaintiff's inability to recover possession during the unlawful detainer actions "precluded Plaintiff from securing long-term fixed rate re-financing during a period of historically low interest rates," forcing plaintiff to incur "dramatically increased expenditures to complete the same renovations in today's much higher interest rate environment." Ultimately, plaintiff was able to collect only a fraction of the back rent it was owed.

The complaint further alleged that defendant, after she was no longer a resident, "continue[d] to interfere in Plaintiff's contractual relationships by contacting current tenants at the Property and urging them to breach their agreements and stop paying rent. In the process, she is also maliciously spreading lies about Plaintiff and the Property. [Defendant] is telling current residents that Plaintiff is selling the property, that Plaintiff is not making repairs to the property, that residents should stop paying their rent, and that residents have to join [the tenant association] if they want to find out more information," upsetting current tenants and damaging plaintiff's relationship with them.

The complaint alleges plaintiff, in addition to delivering the October 2018 notices of rent increases to become effective in November 2019, "attempted in good faith to engage with tenants to ensure that genuinely low-income residents could continue to afford to live in the Property" after the rent restrictions terminated, but defendant blocked those efforts and did not share plaintiff's overtures with the other tenants. The complaint alleged the tenant association was a "sham entity" defendant used "to improperly enrich herself," including paying herself consulting fees for work she had already performed voluntarily. Defendant "urged residents . . . not to respond to Plaintiff's communications"; and the tenants followed her advice, "never responded to Plaintiff, and left Plaintiff unable to reach any sort of agreement with low-income residents in the affordable units for ongoing rent abatements." Defendant "then lobbied tenants at the Property to stop paying rent entirely."

Plaintiff recovered about half of defendant's unpaid rent (paid by a city housing program), but defendant "still owes Plaintiff over $40,000 in unpaid rent from January 2020 through

9

2022, in addition to legal costs and other associated damages." Plaintiff sought to recover the remaining balances of unpaid rent that defendant and the tenants withheld at defendant's direction; interest and penalties; additional business expenses resulting from defendant's intentional interference with plaintiff's prospective business relations; "damages caused by lack of cash and hindrance of Plaintiff's development of Property"; legal costs; attorney fees and punitive damages.

## 5. Defendant's Anti-SLAPP motion

Defendant responded on January 24, 2023, with an anti-SLAPP motion, asking the trial court to strike the intentional interference claim and the UCL claim. Defendant denied she advised other tenants to not pay any rent, but she admitted she told other tenants that, starting on January 1, 2020, they should pay only their rental amount as of March 15, 2019, plus 8.3 percent. She contended her statements "occurred in the context of litigation among plaintiff, [defendant], and the other tenants against whom plaintiff filed unlawful detainer actions"; the anti-SLAPP statute protects communications preparatory to or in anticipation of the bringing of an action; and her statements were " 'in connection with' an issue under consideration or review" by a judicial body. Defendant also contended her statements were protected because they concerned tenants' rights that were matters of public interest.

In support of her motion, defendant submitted her own declaration, including as an exhibit a November 8, 2019 letter to plaintiff's counsel from Ms. Rollins, regarding the Housing Rights Center's assistance to several of the tenants (including defendant) in paying their increased rental payments for November and December 2019. Defendant also requested

10

judicial notice of the tenant association's December 2, 2019 complaint seeking to enforce the statutory right of a qualified entity to attempt in good faith to purchase the property; plaintiff's unlawful detainer complaint against her and her June 2022 motion to enter judgment on the claimed settlement of that action (which was denied); and the June 16, 2022 complaint in the toxic tort litigation that defendant and other tenants filed against plaintiff after they discovered, on or about September 21, 2021, their alleged exposure to toxic compounds on the property.

Defendant's declaration recited various background events already described. Defendant quoted from the November 8, 2019 letter from Ms. Rollins, which explained to plaintiff's counsel the program under which the Housing Rights Center was assisting several of the tenants with their increased rental payments for November and December 2019. The letter was written almost two weeks before Ms. Rollins corresponded with plaintiff's counsel, acknowledging that the November 1, 2019 rates were "initial unassisted rental rates following the termination of the affordability covenants," as allowed by the new state law, and that the new law did not require the rents to roll back on January 1, 2020. In the earlier letter which preceded her communications with plaintiff's counsel, Ms. Rollins stated that housing providers were required to accept third party rent payments such as those made by the Housing Rights Center, and that those tenants were "also protected" under the Tenant Protection Act as of January 1, 2020, under which "the monthly rental amount for each unit rolls back to the monthly rental amount of March 15, 2019."

Defendant declared that: "After consulting with Leona Rollins of the Housing Rights Center, I was persuaded that these rent increases were unlawful. Based on the information that I

11

received from the Housing Rights Center, I informed the other tenants that if they chose to resist the rent hikes, starting on January 1, 2020, they should pay their rental amount as of March 15, 2019 (stipulated to by the TPA as their base rent), plus 8.3%. I never advised other tenants at the Santa Fe Art Colony to not pay rent."

Defendant also declared that "I do not owe plaintiff any back rent. The rent that plaintiff sought in the unlawful detainer action and is attempting to collect pursuant to its first cause of action for breach of contract is in excess of the 8.3% rent increase allowed pursuant to the Tenant Protection Act." (This statement conflicts with the court ruling to the contrary in September 2021.)

### 6. Plaintiff's Opposition

Plaintiff's opposition contended defendant failed to show her advice to other tenants to withhold rent was protected litigation activity for various reasons, including that plaintiff filed the unlawful detainer actions only after defendant told other tenants to withhold rent, and after the tenants "in fact halt[ed] their rent payments." Further, defendant's communications that caused the tenants to breach their leases by withholding rent were not made in furtherance of the toxic tort litigation or the tenant association's purchase litigation, nor did they concern issues of public interest.

Plaintiff supported its opposition with declarations from plaintiff's counsel Amy Forbes (the Forbes declaration) and from Mr. Lazo and Rosie Casas, as well as a request for judicial notice of multiple documents.

The Forbes declaration recounted background facts that are not in dispute and also described various attempts by plaintiff in

July 2018 and later to explore options with counsel for the tenant association (then the UCI Law Clinic) to create long-term affordability for some of the units. The Forbes declaration also described the events of November and December 2019 that we have recounted in part 2, *ante,* including counsel's showing to the city attorney, the Housing Department, and the Housing Rights Center that plaintiff's rental increases were legal.

Mr. Lazo was plaintiff's property director. His declaration stated that "[o]ne day in January 2020," he overheard defendant tell a group of tenants "that they should all stop paying their rent entirely." Mr. Lazo stated that "two of the tenants in th[e] group—who I knew were then-current on their rent—appeared hesitant and began to push back on [defendant's] advice by pointing out that it could be risky," and defendant "tried to convince them otherwise." Mr. Lazo stated he then "intervened and told [defendant] that whatever issues she may have with the condition of the property, the landlord, or the rent raises, she cannot go around telling tenants to withhold their rent." He also told the group that if any of them needed rental assistance, he could help them work with upper management to see if an agreement could be reached, "but I reiterated that they cannot simply withhold rent until they get approved." Defendant "told [Mr. Lazo he] didn't know what [he] was talking about."

Ms. Casas was "responsible for overseeing all aspects of property management" at plaintiff's property. Her declaration stated that she learned in mid-January that 21 tenants had attempted to pay only part of the rent due on January 1, 2020, and when the policy of not accepting partial payments was explained to them, "they refused to pay the full amount due." Ms. Casas stated that "[a]round that time, [she] also learned"

13

that Mr. Lazo had overheard defendant telling the other tenants "to stop paying their rent all together." Ms. Casas also described the amounts of rent withheld by the tenants, the amounts recovered from them, amounts not yet recovered, and legal costs incurred in connection with the unlawful detainer actions.

Defendant filed a reply to plaintiff's opposition, and the following day, May 9, 2023, plaintiff dismissed its UCL claim.

## 7. **The Trial Court's Ruling**

On September 5, 2023, the trial court granted defendant's motion to strike the intentional interference and UCL claims. (Oddly, defendant argues plaintiff waived any argument on appeal regarding the UCL claim. We have no idea why defendant made that peculiar contention, since plaintiff voluntarily dismissed its UCL claim and appeals only the grant of the anti-SLAPP motion on the cause of action for intentional interference with contract.)

The court found the complaint was "based on alleged statements that occurred in the context of litigation between Plaintiff, [defendant], and other tenants against whom Plaintiff filed unlawful detainer actions." The claims against defendant were "based on [defendant] communicating with other tenants about enforcing their rights under the Tenant Protection Act; the presence of toxic chemicals at the Property and Plaintiff's failure to remediate the toxic chemicals, which is the subject matter of [the June 2022 toxic tort action]; and [defendant's] communications [on October 31, 2021,] with another tenant about the possibility of Plaintiff selling the Property, and [the tenant association's] right to buy the Property at its market value in [the tenant association's right to purchase lawsuit]."

14

As for plaintiff's likelihood of success, the court found plaintiff submitted admissible evidence of all the elements of an intentional interference claim:  valid leases with the tenants; defendant's knowledge of those leases; "admissible evidence of [defendant's] intent to commit a wrongful act" (the Lazo affidavit); evidence the tenants withheld rent and never paid rent for over two years; and evidence plaintiff suffered economic harm. But the court found defendant's advice to tenants to withhold rent was privileged "because litigation was imminent when the dispute arose concerning the amount of rent that Plaintiff could charge tenants."

The court continued:  "Further, [defendant's] alleged comments to other tenants [in October 2021 and after she left in June 2022] that Plaintiff was not maintaining the property were in furtherance of [the right to purchase lawsuit and the toxic tort lawsuit], as [defendant] is a plaintiff in [the toxic tort action], which arose from [defendant's] petitioning activity at issue in the instant case," and "[a]s such, the litigation privilege applies to [defendant's] alleged advice to tenants."

In sum, the court conflated all the disparate lawsuits to which plaintiff and defendant were parties as if they were all one and the same, despite the completely different and inconsistent allegations, different alleged harms and defenses, and disparate time frames involved in the unrelated lawsuits.

The trial court later awarded defendant $61,360 in attorney fees.

Plaintiff filed timely notices of appeal from the trial court's orders.

15

# DISCUSSION

## 1.    The Law

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ."  (§ 425.16, subd. (b)(1).)  Acts in furtherance of free speech rights in connection with a public issue include, as relevant to this appeal, statements "made before a . . . judicial proceeding" or "made in connection with an issue under consideration or review by a . . . judicial body" (*id*., subds. (e)(1) & (2)); and "any other conduct" in furtherance of rights of petition or free speech "in connection with a public issue or an issue of public interest" (*id.,* subd. (e)(4)).

When ruling on an anti-SLAPP motion, the trial court employs a two-step process.  The moving defendant must establish the challenged allegations or claims arise from the defendant's protected activity.  If the defendant does so, " 'the plaintiff must then demonstrate its claims have at least "minimal merit." ' "  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)  " '[C]laims with the requisite minimal merit may proceed.' "  (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 385.)

Our review is de novo.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

## 2.    Prong 1:  The Claims Do Not Arise from Protected Activity.

Step one of the anti-SLAPP analysis requires us to decide whether defendant as the moving party has shown the intentional interference claim arises from her protected speech or petitioning activity.  (§ 425.16, subd. (b)(1); *Castleman v. Sagaser*

16

(2013) 216 Cal.App.4th 481, 490.) "A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062.) We review the parties' pleadings, declarations, and other supporting documents at this stage of the analysis "only 'to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.' " (*Castleman*, at p. 491.)

We conclude plaintiff's intentional interference claim does not arise from any activity protected by the anti-SLAPP statute.

The communications that give rise to plaintiff's intentional interference claim are defendant's January 2020 statements to 20 other tenants urging them to stop paying rent. The complaint's allegations that defendant "continue[s] to interfere in Plaintiff's business affairs" by telling "at least one current tenant . . . that Plaintiff will not conduct repairs" and "is planning to sell," and that "the tenants should stop paying their rent" are *not* the basis for its intentional interference claim (and cannot be, because no actual breach or disruption of any other lease occurred or is alleged as a consequence of defendant's later interference after she vacated her unit).

Both defendant and the trial court conflated these later communications (in October 2021 and after June 2022) with defendant's January 2020 statements advising tenants to withhold their rent payments. As plaintiff's counsel told the trial court, "this tortious interference claim is about one thing, the January 2020 statement." The later statements do not form the basis of the interference claim and thus there is no occasion to discuss them in our analysis.

17

Section 425.16, subdivision (e)(1) protects "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law." (*Ibid*.)  Subdivision (e)(2) protects "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2).)  The statements defendant made to induce other tenants to withhold their rent payments were not made in a judicial proceeding.  They were not made in connection with any issue "under consideration or review" by a judicial body. (*Ibid*.)  They were not made in furtherance of defendant's objectives in any pending or imminent litigation.  And they were not "other conduct" in furtherance of the exercise of free speech rights in connection with an issue of public interest.

### a. Defendant's statements were not protected, prelitigation communications.

The trial court held that defendant's prelitigation statements were in connection with "an issue under consideration or review" in the tenant association's then-pending right to purchase case, and in the toxic tort case defendant and other tenants brought more than two years later.  This was erroneous as a matter of law.

As plaintiff points out, the toxic tort litigation "was not contemplated, imminent, or even knowable [in] late 2019 and January 2020," when defendant urged tenants to stop paying rent.  The complaint alleges the tenant-plaintiffs did not discover their alleged exposure to toxic compounds until September 2021.  The toxic tort case had nothing to do with the amount of rent that was due or tenants' ability to pay partial rent or no rent at all.

18

The tenant association's right to purchase case *was* pending when defendant told other tenants to withhold rent in 2019 and 2020. But that case had nothing to do with the amount of rent that was due either. That action involved only whether the tenant association's offer to purchase the property was bona fide and therefore obligated plaintiff to negotiate a purchase price in accordance with the statute. Significantly, the tenant association only had a right to negotiate with plaintiff to buy the property if plaintiff lawfully exercised its right to raise rents to market rates—which, of course, the tenants disputed in their unlawful detainer cases. The mere existence of another lawsuit involving the same parties does not immunize statements or conduct unrelated to the issues in that lawsuit. (Cf. *Episcopal Church Cases* (2009) 45 Cal.4th 467, 478 ["The additional fact that protected activity may lurk in the background—and may explain why the rift between the parties arose in the first place—does not transform a [nonprotected] property dispute into a SLAPP suit."].)

That brings us to the unlawful detainer actions that were the result of defendant telling other tenants (in contrast to the premise of the tenant association's right to purchase case) that plaintiff had *not* lawfully raised rents to market rates. The trial court stated that the intentional interference claims against defendant were "based on [defendant] communicating with other tenants about enforcing their rights under the Tenant Protection Act" (as well as about the other two lawsuits just discussed). The court's conclusion as to the unlawful detainer cases is also erroneous as a matter of law.

The relationship between the anti-SLAPP statute and the litigation privilege is described in *Flatley v. Mauro* (2006)

39 Cal.4th 299, 322-324. Courts "have looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry—that is, by examining the scope of the litigation privilege to determine whether a given communication falls within the ambit of subdivision (e)(1) and (2)." (*Id.* at pp. 322-323.)

The litigation privilege is codified in Civil Code section 47, subdivision (b). "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)

Defendant was not a party to any of the 20 unlawful detainer actions against other tenants, so defendant had no privilege in connection with those actions to tell other tenants to stop paying rent. Nothing about defendant advising other tenants to breach their leases was in furtherance of defendant's own right of resort to the courts for assistance in resolving her own dispute with plaintiff. No litigation-related interest of defendant's was served by telling other tenants to breach their leases in solidarity with her. Precipitating eviction litigation against other tenants by urging them to withhold their rent undermines the policy reasons for the litigation privilege. (See *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1146 ["The litigation privilege exists so that persons who have been harmed or have other grievances calling for redress through the judicial processes can and will use the courts, rather than self-help, to obtain relief."]; see *ibid.* [for litigation privilege to apply,

20

statement "must function as a necessary or useful step in the litigation process and must serve its purposes. This is a very different thing from saying that the communication's *content* need only be related in some way to the subject matter of the litigation."].)

Defendant argues her statements urging tenants to withhold rent were consistent with the policy that allows tenants to do so when landlords violate the implied warranty of habitability, citing *Green v. Superior Court* (1974) 10 Cal.3d 616 (breach of the implied warranty of habitability may be raised as a defense in an unlawful detainer action). *Green* does not help defendant, who produced no evidence whatever of habitability issues.

Then defendant contends she "reasonably believed, based on advice from counsel who represented her and the other tenants in the unlawful detainer actions, that the tenants owed only their 2019 rents plus 8.3%." There is no evidence of this either. The evidence defendant cites is paragraph 13 of her declaration (quoted at pp. 11-12, *ante*), about information she received from the Housing Rights Center. This is not evidence (and there is no evidence) that Ms. Rollins "represented her and the other tenants in the unlawful detainer actions" (or even that Ms. Rollins is an attorney). There is no evidence Ms. Rollins or any counsel advised defendant to withhold rent. And there *is* evidence that as of November 21, 2019, Ms. Rollins herself agreed that plaintiff's rent increases were permitted under the Tenant Protection Act and that she was planning to convey that information to the residents.

In short, the contention in the respondent's brief—that defendant "relay[ed] information that she obtained from

21

attorneys who represented the other tenants" in furtherance of the tenants' right to petition the court—finds no support in the evidence or the law. The anti-SLAPP statute does not protect prelitigation statements made to encourage third parties to breach their contracts.

We do not base our conclusion on plaintiff's theory that the unlawful detainer actions against defendant and the other 20 tenants were not imminent when defendant told a group of tenants to stop paying rent. As recounted above, defendant testified in her declaration that she told other tenants to pay partial rent on January 1, 2020, but denied later telling them to stop paying rent. Plaintiff's onsite property director, Mr. Lazo, and plaintiff's portfolio property manager, Ms. Casas, both testified—consistently with defendant's testimony—that 21 tenants tendered only partial rent payments on January 1, 2020, which plaintiff did not accept. Plaintiff filed unlawful detainer complaints against defendant and at least one other tenant on or around January 14 or 15, 2020, presumably because they tendered only partial rent on January 1, 2020. The record does not include evidence of when the unlawful detainer actions were filed against the other 19 tenants. (The complaint alleges the 21 tenants stopped paying rent in January 2020 and that plaintiff "immediately" filed actions against the 21 tenants.)

Both Ms. Casas and Mr. Lazo testified that on an unspecified date in January 2020, Mr. Lazo overheard defendant telling a group of other tenants to stop paying their rent, presumably beginning February 1, 2020. But there is no record evidence that plaintiff filed unlawful detainer actions because tenants stopped paying rent on defendant's advice beginning February 1, 2020. Thus, we do not find on this record the

22

unlawful detainer cases were not imminent or pending when defendant made her statements in January 2020 that form the basis for the intentional interference claim.

We find the anti-SLAPP statute does not protect defendant's statements irrespective of whether the unlawful detainer actions were imminent or pending when defendant told tenants to stop paying rent. Defendant's statements were not protected because, as we have explained, they were not made in a judicial proceeding or in connection with any issue under consideration in a judicial proceeding, and defendant had no litigation-related interest in the unlawful detainer actions against other tenants.

### b. Defendant's statements were not made in connection with a public issue or an issue of public interest.

Defendant contends her communications urging tenants to withhold rent "clearly contributed to a matter of public interest" and were therefore protected under section 425.16, subdivision (e)(4). That provision is known as the "catchall" provision, and it protects "any other conduct" in furtherance of the exercise of free speech rights "in connection with a public issue or an issue of public interest." (*Ibid*.) It does not apply here.

The relevant analysis appears in *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*), which provides direction on how a court should analyze whether communications qualify for anti-SLAPP protection under the catchall provision. We are required to consider the content and the context of a statement. (*Id*. at p. 149.) We first look to the content of the speech by asking what public issue or issue of public interest is implicated by the speech in question. (*Ibid*.) And then we

23

consider "what functional relationship exists between the speech and the public conversation about some matter of public interest." (*Id.* at pp. 149-150.) "[W]e examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.) "[A] statement is made 'in connection with' a public issue when it contributes to—that is, 'participat[es]' in or furthers—some public conversation on the issue." (*Ibid.*)

Defendant identifies the public issue implicated by her conduct as "the availability of adequately maintained, affordable housing." Assuming that satisfies the first (content) step of the *FilmOn* analysis, we are required to consider the second (functional relationship) step. Defendant's communications did not satisfy *FilmOn*'s functional relationship test. (See *FilmOn, supra,* 7 Cal.5th at p. 150 [" '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate' "].)

Defendant did not participate in or further any public conversation on the issue of affordable housing. Indeed, defendant's one-sentence argument on this point is that her actions "raised the profile of habitability and affordability issues to such a degree that both issues resulted in litigation concerning these issues," citing the tenant association's right to purchase action and her toxic tort action. As we have already seen, those lawsuits had nothing to do with defendant's statements in 2020 urging 20 other tenants to withhold rent. Defendant's statements were "too tenuously tethered to the issues of public interest they implicate, and too remotely connected to the public

24

conversation about those issues, to merit protection under the catchall provision." (*FilmOn, supra,* 7 Cal.5th at p. 140.)

**3.    Conclusion**

Having found no protected activity, we need not address whether plaintiff established the requisite minimal merit of its claim, and we necessarily reverse the trial court's order awarding defendant attorney fees.

## DISPOSITION

The trial court's orders granting defendant's anti-SLAPP motion and granting defendant's motion for attorney fees are reversed.  Appellant shall recover its costs on appeal.


GRIMES, J.


WE CONCUR:



STRATTON, P. J.



WILEY, J.

25